Justice Alito
delivered the opinion of the Court.
These consolidated cases arise from litigation that began in Arizona in 1992 when a group of English language-learner (ELL) students in the Nogales Unified School District (No-gales) and their parents filed a class action, alleging that the State was violating the Equal Educational Opportunities Act of 1974 (EEOA), § 204(f), 88 Stat. 515, 20 U. S. C. § 1703(f), *439 which requires a State “to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs.” In 2000, the District Court entered a declaratory judgment with respect to Nogales, and in 2001, the court extended the order to apply to the entire State. Over the next eight years, petitioners repeatedly sought relief from the District Court’s orders, but to no avail. We granted certiorari after the Court of Appeals for the Ninth Circuit affirmed the denial of petitioners’ motion for relief under Federal Rule of Civil Procedure 60(b)(5), and we now reverse the judgment of the Court of Appeals and remand for further proceedings.
As we explain, the District Court and the Court of Appeals misunderstood both the obligation that the EEOA imposes on States and the nature of the inquiry that is required when parties such as petitioners seek relief under Rule 60(b)(5) on the ground that enforcement of a judgment is “no longer equitable.” Both of the lower courts focused excessively on the narrow question of the adequacy of the State’s incremental funding for ELL instruction instead of fairly considering the broader question whether, as a result of important changes during the intervening years, the State was fulfilling its obligation under the EEOA by other means. The question at issue in these cases is not whether Arizona must take “appropriate action” to overcome the language barriers that impede ELL students. Of course it must. But petitioners argue that Arizona is now fulfilling its statutory obligation by new means that reflect new policy insights and other changed circumstances. Rule 60(b)(5) provides the vehicle for petitioners to bring such an argument.
I
A
In 1992, a group of students enrolled in the ELL program in Nogales and their parents (plaintiffs) filed suit in the District Court for the District of Arizona on behalf of “all minor *440 ity ‘at risk’ and limited English proficient children . . . now or hereafter, enrolled in [the] Nogales Unified School District . . . as well as their parents and guardians.” Flores v. Arizona, 172 F. Supp. 2d 1225, 1226 (2000). Plaintiffs sought a declaratory judgment holding that the State of Arizona, its board of education, and its superintendent of public instruction (defendants) were violating the EEOA by providing inadequate ELL instruction in Nogales.[1]
The relevant portion of the EEOA states:
“No State shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by—
“(f) the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs.” 20 U. S. C. §1703 (emphasis added).
By simply requiring a State “to take appropriate action to overcome language barriers” without specifying particular actions that a State must take, “Congress intended to leave state and local educational authorities a substantial amount of latitude in choosing the programs and techniques they *441 would use to meet their obligations under the EEOA.” Castaneda v. Pickard, 648 F. 2d 989, 1009 (CA5 1981).
In August 1999, after seven years of pretrial proceedings and after settling various claims regarding the structure of Nogales’ ELL curriculum, the evaluation and monitoring of Nogales’ students, and the provision of tutoring and other compensatory instruction, the parties proceeded to trial. In January 2000, the District Court concluded that defendants were violating the EEOA because the amount of funding the State allocated for the special needs of ELL students (ELL incremental funding) was arbitrary and not related to the actual funding needed to cover the costs of ELL instruction in Nogales. 172 F. Supp. 2d, at 1239. Defendants did not appeal the District Court’s order.
B
In the years following, the District Court entered a series of additional orders and injunctions. In October 2000, the court ordered the State to “prepare a cost study to establish the proper appropriation to effectively implement” ELL programs. Flores v. Arizona, 160 F. Supp. 2d 1043, 1047. In June 2001, the court applied the declaratory judgment order statewide and granted injunctive relief accordingly. No. CIV. 92-596TUCACM, 2001 WL 1028369, *2 (June 25, 2001). The court took this step even though the certified class included only Nogales students and parents and even though the court did not find that any districts other than Nogales were in violation of the EEOA. The court set a deadline of January 31,2002, for the State to provide funding that “bear[s] a rational relationship to the actual funding needed.” Ibid.
In January 2005, the court gave the State 90 days to “appropriately and constitutionally fun[d] the state’s ELL programs taking into account the [Rule’s] previous orders.” No. CIV. 92-596-TUC-ACM, p. 5, App. 393. The State failed to meet this deadline, and in December 2005, the court *442 held the State in contempt. Although the legislature was not then a party to the suit, the court ordered that “the legislature has 15 calendar days after the beginning of the 2006 legislative session to comply with the January 28,2005 Court order. Everyday thereafter ... that the State fails to comply with this Order, [fines] will be imposed until the State is in compliance.” Flores v. Arizona, 405 F. Supp. 2d 1112, 1120. The schedule of fines that the court imposed escalated from $500,000 to $2 million per day. Id., at 1120-1121.
C
Defendants did not appeal any of the District Court’s orders, and the record suggests that some state officials supported their continued enforcement. In June 2001, the state attorney general acquiesced in the statewide extension of the declaratory judgment order, a step that the State has explained by reference to the Arizona constitutional requirement of uniform statewide school funding. See Brief for Appellee State of Arizona et al. in No. 07-15603 etc. (CA9), p. 60 (citing Ariz. Const., Art. 11, § 1(A)). At a hearing in February 2006, a new attorney general opposed the superintendent’s request for a stay of the December 2005 order imposing sanctions and fines, and filed a proposed distribution of the accrued fines.
In March 2006, after accruing over $20 million in fines, the state legislature passed HB 2064, which was designed to implement a permanent funding solution to the problems identified by the District Court in 2000. Among other things, HB 2064 increased ELL incremental funding (with a 2-year per-student limit on such funding) and created two new funds — a structured English immersion fund and a compensatory instruction fund — to cover additional costs of ELL programming. Moneys in both newly created funds were to be offset by available federal moneys. HB 2064 also instituted several programming and structural changes.
*443 The Governor did not approve of HB 2064’s funding provisions, but she allowed the bill to become law without her signature. Because HB 2064’s incremental ELL funding increase required court approval to become effective, the Governor requested the attorney general to move for accelerated consideration by the District Court. In doing so, she explained: “ ‘After nine months of meetings and three vetoes, it is time to take this matter to a federal judge. I am convinced that getting this bill into court now is the most expeditious way ultimately to bring the state into compliance with federal law.’” Flores v. Arizona, 516 F. 3d 1140, 1153, n. 16 (CA9 2008). The state board of education joined the Governor in opposing HB 2064. Together, the state board of education, the State of Arizona, and the plaintiffs are respondents here.
With the principal defendants in the action siding with the plaintiffs, the Speaker of the State House of Representatives and the President of the State Senate (Legislators) filed a motion to intervene as representatives of their respective legislative bodies. App. 55. In support of their motion, they stated that although the attorney general had a “legal duty” to defend HB 2064, the attorney general had shown “little enthusiasm” for advancing the legislature’s interests. Id., at 57. Among other things, the Legislators noted that the attorney general “failed to take an appeal of the judgment entered in this case in 2000 and has failed to appeal any of the injunctions and other orders issued in aid of the judgment.” Id., at 60. The District Court granted the Legislators’ motion for permissive intervention, and the Legislators and superintendent (together, petitioners here) moved to purge the District Court’s contempt order in light of HB 2064. Alternatively, they moved for relief under Federal Rule of Civil Procedure 60(b)(5) based on changed circumstances.
In April 2006, the District Court denied petitioners’ motion, concluding that HB 2064 was fatally flawed in three *444 respects. First, while HB 2064 increased ELL incremental funding by approximately $80 per student, the court held that this increase was not rationally related to effective ELL programming. Second, the court concluded that imposing a 2-year limit on funding for each ELL student was irrational. Third, according to the court, HB 2064 violated federal law by using federal funds to “supplant” rather than “supplement” state funds. No. CV-92-596-TUC-RCC, pp. 4-8 (Apr. 25, 2006), App. to Pet. for Cert. in No. 08-294, pp. 176a, 181a-182a. The court did not address petitioners’ Rule 60(b)(5) claim that changed circumstances rendered continued enforcement of the original declaratory judgment order inequitable. Petitioners appealed.
In an unpublished decision, the Court of Appeals for the Ninth Circuit vacated the District Court’s April 2006 order, the sanctions, and the imposition of fines, and remanded for an evidentiary hearing to determine whether Rule 60(b)(5) relief was warranted. Flores v. Rzeslawski, 204 Fed. Appx. 580 (2006).
On remand, the District Court denied petitioners’ Rule 60(b)(5) motion. Flores v. Arizona, 480 F. Supp. 2d 1157, 1167 (Ariz. 2007). Holding that HB 2064 did not establish “a funding system that rationally relates funding available to the actual costs of all elements of ELL instruction,” id., at 1165, the court gave the State until the end of the legislative session to comply with its orders. The State failed to do so, and the District Court again held the State in contempt. No. CV 92-596 TUC-RCC (Oct. 10, 2007), App. 86. Petitioners appealed.
The Court of Appeals affirmed. 516 F. 3d 1140. It acknowledged that Nogales had “made significant strides since 2000,” id., at 1156, but concluded that the progress did not warrant Rule 60(b)(5) relief. Emphasizing that Rule 60(b)(5) is not a substitute for a timely appeal, and characterizing the original declaratory judgment order as centering on the adequacy of ELL incremental funding, the Court of *445 Appeals explained that relief would be appropriate only if petitioners had shown “either that there are no longer incremental costs associated with ELL programs in Arizona” or that Arizona had altered its funding model. Id., at 1169. The Court of Appeals concluded that petitioners had made neither showing, and it rejected petitioners’ other arguments, including the claim that Congress’ enactment of the No. Child Left Behind Act of 2001 (NCLB), 115 Stat. 1425, codified in Title 20 U. S. C. § 6842, constituted a changed legal circumstance that warranted Rule 60(b)(5) relief.
We granted certiorari, 555 U. S. 1092 (2009), and now reverse.
II
Before addressing the merits of petitioners’ Rule 60(b)(5) motion, we consider the threshold issue of standing — “an essential and unchanging part of the case-or-controversy requirement of Article III.” Lujan v. Defenders of Wildlife, 504 U. S. 555, 560 (1992). To establish standing, a plaintiff must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant’s challenged action; and redressable by a favorable ruling. Id., at 560-561. Here, as in all standing inquiries, the critical question is whether at least one petitioner has “alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction.” Summers v. Earth Island Institute, 555 U. S. 488, 493 (2009) (quoting Warth v. Seldin, 422 U. S. 490, 498 (1975); internal quotation marks omitted).
We agree with the Court of Appeals that the superintendent has standing because he “is a named defendant in the case[,] the Declaratory Judgment held him to be in violation of the EEOA, and the current injunction runs against him.” 516 F. 3d, at 1164 (citation omitted). For these reasons alone, he has alleged a sufficiently “‘personal stake in the outcome of the controversy’ ” to support standing. Warth, supra, at 498; see also United States v. Sweeney, 914 F. 2d *446 1260, 1263 (CA9 1990) (rejecting as “frivolous” the argument that a party does not have “standing to object to orders specifically directing it to take or refrain from taking action”).
Respondents’ only argument to the contrary is that the superintendent answers to the state board of education, which in turn answers to the Governor, and that the Governor is the only Arizona official who “could have resolved the conflict within the Executive Branch by directing an appeal.” Brief for Respondent Flores et al. 22. We need not consider whether respondents’ chain-of-command argument has merit because the Governor has, in fact, directed an appeal. See App. to Reply Brief for Petitioner Superintendent 1 (“I hereby direct [the state attorney general] to file a brief at the [Supreme] Court on behalf of the State of Arizona adopting and joining in the positions taken by the Superintendent of Public Instruction, the Speaker of the Arizona House of Representatives, and the President of the Arizona Senate”).
Because the superintendent clearly has standing to challenge the lower courts’ decisions, we need not consider whether the Legislators also have standing to do so.[2] See, e.g., Arlington Heights v. Metropolitan Housing Development Corp., 429 U. S. 252, 264, and n. 9 (1977) (“[W]e have at least one individual plaintiff who has demonstrated standing .... Because of the presence of this plaintiff, we need not consider whether the other individual and corporate *447 plaintiffs have standing to maintain the suit”). Accordingly, we proceed to the merits of petitioners’ Rule 60(b)(5) motion.
Ill
A
Federal Rule of Civil Procedure 60(b)(5) permits a party to obtain relief from a judgment or order if, among other things, “applying [the judgment or order] prospectively is no longer equitable.” Rule 60(b)(5) may not be used to challenge the legal conclusions on which a prior judgment or order rests, but the Rule provides a means by which a party can ask a court to modify or vacate a judgment or order if “a significant change either in factual conditions or in law” renders continued enforcement “detrimental to the public interest.” Rufo v. Inmates of Suffolk County Jail, 502 U. S. 367, 384 (1992). The party seeking relief bears the burden of establishing that changed circumstances warrant relief, id., at 383, but once a party carries this burden, a court abuses its discretion “when it refuses to modify an injunction or consent decree in light of such changes,” Agostini v. Felton, 521 U. S. 203, 215 (1997).
Rule 60(b)(5) serves a particularly important function in what we have termed “institutional reform litigation.”[3] Rufo, supra, at 380. For one thing, injunctions issued in *448 such cases often remain in force for many years, and the passage of time frequently brings about changed circumstances — changes in the nature of the underlying problem, changes in governing law or its interpretation by the courts, and new policy insights — that warrant reexamination of the original judgment.
Second, institutional reform injunctions often raise sensitive federalism concerns. Such litigation commonly involves areas of core state responsibility, such as public education. See Missouri v. Jenkins, 515 U. S. 70, 99 (1995) (“[O]ur cases recognize that local autonomy of school districts is a vital national tradition, and that a district court must strive to restore state and local authorities to the control of a school system operating in compliance with the Constitution” (citation omitted)); United States v. Lopez, 514 U. S. 549, 580 (1995) (Kennedy, J., concurring).
Federalism concerns are heightened when, as in these cases, a federal-court decree has the effect of dictating state or local budget priorities. States and local governments have limited funds. When a federal court orders that money be appropriated for one program, the effect is often to take funds away from other important programs. See Jenkins, supra, at 131 (Thomas, J., concurring) (“A structural reform decree eviscerates a State’s discretionary authority over its own program and budgets and forces state officials to reallocate state resources and funds”).
Finally, the dynamics of institutional reform litigation differ from those of other cases. Scholars have noted that public officials sometimes consent to, or refrain from vigorously opposing, decrees that go well beyond what is required by federal law. See, e.g., McConnell, Why Hold Elections? Using Consent Decrees To Insulate Policies From Political Change, 1987 U. Chi. Legal Forum 295, 317 (noting that government officials may try to use consent decrees to “block ordinary avenues of political change” or to “sidestep political constraints”); Horowitz, Decreeing Organizational Change: *449 Judicial Supervision of Public Institutions, 1983 Duke L. J. 1265, 1294-1295 (“Nominal defendants [in institutional reform cases] are sometimes happy to be sued and happier still to lose”); R. Sandler & D. Schoenbrod, Democracy by Decree: What Happens When Courts Run Government 170 (2003) (“Government officials, who always operate under fiscal and political constraints, ‘frequently win by losing’” in institutional reform litigation).
Injunctions of this sort bind state and local officials to the policy preferences of their predecessors and may thereby “improperly deprive future officials of their designated legislative and executive powers.” Frew v. Hawkins, 540 U. S. 431, 441 (2004). See also Northwest Environment Advocates v. EPA, 340 F. 3d 853, 855 (CA9 2003) (Kleinfeld, J., dissenting) (noting that consent decrees present a risk of collusion between advocacy groups and executive officials who want to bind the hands of future policymakers); Ragsdale v. Turnock, 941 F. 2d 501, 517 (CA7 1991) (Flaum, J., concurring in part and dissenting in part) (“[I]t is not uncommon for consent decrees to be entered into on terms favorable to those challenging governmental action because of rifts within the bureaucracy or between the executive and legislative branches”); Easterbrook, Justice and Contract in Consent Judgments, 1987 U. Chi. Legal Forum 19, 40 (“Tomorrow’s officeholder may conclude that today’s is wrong, and there is no reason why embedding the regulation in a consent decree should immunize it from reexamination”).
States and localities “depen[d] upon successor officials, both appointed and elected, to bring new insights and solutions to problems of allocating revenues and resources.” Frew, supra, at 442. Where “state and local officials . . . inherit overbroad or outdated consent decrees that limit their ability [to] respond to the priorities and concerns of their, constituents,” they are constrained in their ability to fulfill their duties as democratically elected officials. American Legislative Exchange Council, Resolution on the Federal *450 Consent Decree Fairness Act (2006), App. to Brief for American Legislative Exchange Council et al. as Amici Curiae la-4a.
It goes without saying that federal courts must vigilantly enforce federal law and must not hesitate in awarding necessary relief. But in recognition of the features of institutional reform decrees, we have held that courts must take a “flexible approach” to Rule 60(b)(5) motions addressing such decrees. Rufo, 502 U. S., at 381. A flexible approach allows courts to ensure that “responsibility for discharging the State’s obligations is returned promptly to the State and its officials” when the circumstances warrant. Frew, supra, at 442. In applying this flexible approach, courts must remain attentive to the fact that “federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate [federal law] or does not flow from such a violation.” Milliken v. Bradley, 433 U. S. 267, 282 (1977). “If [a federal consent decree is] not limited to reasonable and necessary implementations of federal law,” it may “improperly deprive future officials of their designated legislative and executive powers.” Frew, 540 U. S., at 441.
For these reasons, a critical question in this Rule 60(b)(5) inquiry is whether the objective of the District Court’s 2000 declaratory judgment order — i. e., satisfaction of the EEOA’s “appropriate action” standard — has been achieved. See id., at 442. If a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper. See Milliken, supra, at 282. We note that the EEOA itself limits court-ordered remedies to those that “are essential to correct particular denials of equal educational opportunity or equal protection of the laws.” 20 U. S. C. § 1712 (emphasis added).
B
The Court of Appeals did not engage in the Rule 60(b)(5) analysis just described. Rather than applying a flexible *451 standard that seeks to return control to state and local officials as soon as a violation of federal law has been remedied, the Court of Appeals used a heightened standard that paid insufficient attention to federalism concerns. And rather than inquiring broadly into whether changed conditions in Nogales provided evidence of an ELL program that complied with the EEOA, the Court of Appeals concerned itself only with determining whether increased ELL funding complied with the original declaratory judgment order. The court erred on both counts.
1
The Court of Appeals began its Rule 60(b)(5) discussion by citing the correct legal standard, see 516 F. 3d, at 1163 (noting that relief is appropriate upon a showing of “‘a significant change either in factual conditions or in law’ ”), but it quickly strayed. It referred to the situations in which changed circumstances warrant Rule 60(b)(5) relief as “likely rare,” id, at 1167, and explained that, to succeed on these grounds, petitioners would have to make a showing that conditions in Nogales had so changed as to “sweep away” the District Court’s incremental funding determination, id, at 1168. The Court of Appeals concluded that the District Court had not erred in determining that “the landscape was not so radically changed as to justify relief from judgment without compliance.” Id., at 1172 (emphasis added).[4]
Moreover, after recognizing that review of the denial of Rule 60(b)(5) relief should generally be “somewhat closer in the context of institutional injunctions against states ‘due to federalism concerns,’” the Court of Appeals incorrectly *452 reasoned that “federalism concerns are substantially lessened here, as the state of Arizona and the state Board of Education wish the injunction to remain in place.” Id., at 1164. This statement is flatly incorrect, as even respondents acknowledge. Brief for Respondent State of Arizona et al. 20-21. Precisely because different state actors have taken contrary positions in this litigation, federalism concerns are elevated. And precisely because federalism concerns are heightened, a flexible approach to Rule 60(b)(5) relief is critical. “[Wjhen the objects of the decree have been attained” — namely, when EEOA compliance has been achieved — “responsibility for discharging the State’s obligations [must be] returned promptly to the State and its officials.” Frew, supra, at 442.
2
In addition to applying a Rule 60(b)(5) standard that was too strict, the Court of Appeals framed a Rule 60(b)(5) inquiry that was too narrow — one that focused almost exclusively on the sufficiency of incremental funding. In large part, this was driven by the significance the Court of Appeals attributed to petitioners’ failure to appeal the District Court’s original order. The Court of Appeals explained that “the central idea” of that order was that without sufficient ELL incremental funds, “ELL programs would necessarily be inadequate.” 516 F. 3d, at 1167-1168. It felt bound by this conclusion, lest it allow petitioners to “reopen matters made final when the Declaratory Judgment was not appealed.” Id., at 1170. It repeated this refrain throughout its opinion, emphasizing that the “ ‘interest in finality must be given great weight,’” id., at 1163, and explaining that petitioners could not now ask for relief “on grounds that could have been raised on appeal from the Declaratory Judgment and from earlier injunctive orders but were not,” id., at 1167. “If [petitioners] believed that the district court erred and should have looked at all funding sources differ *453 ently in its EEOA inquiry,” the court wrote, “they should have appealed the Declaratory Judgment.” Id., at 1171.
In attributing such significance to the defendants’ failure to appeal the District Court’s original order, the Court of Appeals turned the risks of institutional reform litigation into reality. By confining the scope of its analysis to that of the original order, it insulated the policies embedded in the order — specifically, its incremental funding requirement— from challenge and amendment.[5] But those policies were supported by the very officials who could have appealed them — the state defendants — and, as a result, were never subject to true challenge.
Instead of focusing on the failure to appeal, the Court of Appeals should have conducted the type of Rule 60(b)(5) inquiry prescribed in Rufo. This inquiry makes no reference to the presence or absence of a timely appeal. It takes the original judgment as a given and asks only whether “a significant change either in factual conditions or in law” renders continued enforcement of the judgment “detrimental to the public interest.” Rufo, 502 U. S., at 384. It allows a court to recognize that the longer an injunction or consent decree stays in place, the greater the risk that it will improperly interfere with a State’s democratic processes.
The Court of Appeals purported to engage in a “changed circumstances” inquiry, but it asked only whether changed circumstances affected ELL funding and, more specifically, ELL incremental funding. Relief was appropriate, in the court’s view, only if petitioners “demonstrate[d] either that *454 there [we]re no longer incremental costs associated with ELL programs in Arizona or that Arizona’s ‘base plus incremental costs’ educational funding model was so altered that focusing on ELL-specific incremental costs funding has become irrelevant and inequitable.” 516 F. 3d, at 1169.
This was a Rule 60(b)(5) “changed circumstances” inquiry in name only. In reality, it was an inquiry into whether the deficiency in ELL incremental funding that the District Court identified in 2000 had been remedied. And this, effectively, was an inquiry into whether the original order had been satisfied. Satisfaction of an earlier judgment is one of the enumerated bases for Rule 60(b)(5) relief — but it is not the only basis for such relief.
Rule 60(b)(5) permits relief from a judgment where “[i] the judgment has been satisfied, released or discharged; [ii] it is based on an earlier judgment that has been reversed or vacated; or [iii] applying it prospectively is no longer equitable.” (Emphasis added.) Use of the disjunctive “or” makes it clear that each of the provision’s three grounds for relief is independently sufficient and therefore that relief may be warranted even if petitioners have not “satisfied” the original order. As petitioners argue, they may obtain relief if prospective enforcement of that order “is no longer equitable.”
To determine the merits of this claim, the Court of Appeals needed to ascertain whether ongoing enforcement of the original order was supported by an ongoing violation of federal law (here, the EEOA). See Milliken, 433 U. S., at 282. It failed to do so.
As previously noted, the EEOA, while requiring a State to take “appropriate action to overcome language barriers,” 20 U. S. C. § 1703(f), “leave[s] state and local educational authorities a substantial amount of latitude in choosing” how this obligation is met. Castaneda, 648 F. 2d, at 1009. Of course, any educational program, including the “appropriate action” mandated by the EEOA, requires funding, but fund *455 ing is simply a means, not the end. By focusing so intensively on Arizona’s incremental ELL funding, the Court of Appeals misapprehended the EEOA’s mandate. And by requiring petitioners to demonstrate “appropriate action” through a particular funding mechanism, the Court of Appeals improperly substituted its own educational and budgetary policy judgments for those of the state and local officials to whom such decisions are properly entrusted. Cf. Jenkins, 515 U. S., at 131 (Thomas, J., concurring) (“Federal courts do not possess the capabilities of state and local governments in addressing difficult educational problems”).
C
The underlying District Court opinion reveals similar errors. In an August 2006 remand order, a different Ninth Circuit panel had instructed the District Court to hold an evidentiary hearing “regarding whether changed circumstances required modification of the original court order or otherwise had a bearing on the appropriate remedy.” 204 Fed. Appx., at 582. The Ninth Circuit panel observed that “federal courts must be sensitive to the need for modification [of permanent injunctive relief] when circumstances change.” Ibid, (internal quotation marks omitted).
The District Court failed to follow these instructions. Instead of determining whether changed circumstances warranted modification of the original order, the District Court asked only whether petitioners had satisfied the original declaratory judgment order through increased incremental funding. See 480 F. Supp. 2d, at 1165 (explaining that a showing of “mere amelioration” of the specific deficiencies noted in the District Court’s original order was “inadequate” and that “compliance would require a funding system that rationally relates funding available to the actual costs of all elements of ELL instruction” (emphasis added)). The District Court stated: “It should be noted that the Court finds the same problems today that it saw last year, because HB *456 2064 is the same, the problems themselves are the same.”[6] Id., at 1161. The District Court thus rested its postremand decision on its preremand analysis of HB 2064. It disregarded the remand instructions to engage in a broad and flexible Rule 60(b)(5) analysis as to whether changed circumstances warranted relief. In taking this approach, the District Court abused its discretion.
D
The dissent defends the narrow approach of the lower courts with four principal conclusions that it draws from the record. All of these conclusions, however, are incorrect and mirror the fundamental error of the lower courts — a fixation on the issue of incremental funding and a failure to recognize the proper scope of a Rule 60(b)(5) inquiry.
First, the dissent concludes that “the Rule 60(b)(5) 'changes' upon which the District Court focused” were not *457 limited to changes in funding, and included “ ‘changed teaching methods’ ” and “ ‘changed administrative systems.’ ” Post, at 483. The District Court did note a range of changed circumstances, concluding that as a result of these changes, Nogales was “doing substantially better.” 480 F. Supp. 2d, at 1160. But it neither focused on these changes nor made up-to-date factual findings. To the contrary, the District Court explained that “it would be premature to make an assessment of some of these changes.” Ibid. Accordingly, of the 28 findings of fact that the court proceeded to make, the first 20 addressed funding directly and exclusively. See id., at 1161-1163. The last eight addressed funding indirectly— discussing reclassification rates because of their relevance to HB 2064’s funding restrictions for ELL and reclassified students. See id., at 1163-1165. None of the District Court’s findings of fact addressed either “‘changed teaching methods’” or “‘changed administrative systems.’”
The dissent’s second conclusion is that “ ‘incremental funding’ costs . . . [were] the basic contested issue at the 2000 trial and the sole basis for the District Court’s finding of a statutory violation.” Post, at 483. We fail to see this conclusion’s relevance to this Rule 60(b)(5) motion, where the question is whether any change in factual or legal circumstances renders continued enforcement of the original order inequitable. As the dissent itself acknowledges, petitioners “pointed to three sets of changed circumstances [in their Rule 60(b)(5) motion] which, in their view, showed that the judgment and the related orders were no longer necessary.” Post, at 482. In addition to “increases in the amount of funding available to Arizona school districts,” these included “changes in the method of English-learning instruction,” and “changes in the administration of the Nogales school district.” Ibid.
Third, the dissent concludes that “the type of issue upon which the District Court and Court of Appeals focused” — the incremental funding issue — “lies at the heart of the statutory *458 demand for equal educational opportunity.” Post, at 484. In what we interpret to be a restatement of this point, the dissent also concludes that sufficient funding (“the ■resource’ issue”) and the presence or absence of an EEOA violation (“the statutory subsection (f) issue”) “are one and the same. ” Post, at 485 (emphasis in original). “In focusing upon the one,” the dissent asserts, “the District Court and Court of Appeals were focusing upon the other.” Ibid.
Contrary to the dissent’s assertion, these two issues are decidedly not “one and the same.”[7] Ibid. Nor is it the case, as the dissent suggests, that the EEOA targets States’ provision of resources for ELL programming. [8] Post, at 484. *459 What the statute forbids is a failure to take “appropriate action to overcome language barriers.” 20 U. S. C. § 1703(f). Funding is merely one tool that may be employed to achieve the statutory objective.
Fourth, the dissent concludes that the District Court did not order increased ELL incremental funding and did not dictate state and local budget priorities. Post, at 486. The dissent’s point — and it is a very small one — is that the District Court did not set a specific amount that the legislature was required to appropriate. The District Court did, however, hold the State in contempt and impose heavy fines because the legislature did not provide sufficient funding. These orders unquestionably imposed important restrictions on the legislature’s ability to set budget priorities.
E
Because the lower courts — like the dissent — misperceived both the nature of the obligation imposed by the EEOA and the breadth of the inquiry called for under Rule 60(b)(5), these cases must be remanded for a proper examination of at least four important factual and legal changes that may warrant the granting of relief from the judgment: the State’s adoption of a new ELL instructional methodology, Congress’ enactment of NCLB, structural and management reforms in Nogales, and increased overall education funding.
1
At the time of the District Court’s original declaratory judgment order, ELL instruction in Nogales was based primarily on “bilingual education,” which teaches core content areas in a student’s native language while providing English instruction in separate language classes. In November 2000, Arizona voters passed Proposition 203, which man *460 dated statewide implementation of a “structured English immersion” (SEI) approach. See App. to Pet. for Cert. in No. 08-294, at 369a. Proposition 203 defines this methodology as follows:
“‘Sheltered English immersion’ or ‘structured English immersion’ means an English language acquisition process for young children in which nearly all classroom instruction is in English but with the curriculum and presentation designed for children who are learning the language. . . . Although teachers may use a minimal amount of the child’s native language when necessary, no subject matter shall be taught in any language other than English, and children in this program learn to read and write solely in English.” Ariz. Rev. Stat. Ann. § 15-751(5) (West 2009).
In HB 2064, the state legislature attended to the successful and uniform implementation of SEI in a variety of ways.[9] It created an “Arizona English language learners task force” within the state department of education to “develop and adopt research based models of structured English immersion programs for use by school districts and charter schools.” §15-756.01(0). It required that all school districts and charter schools select one of the adopted SEI models, § 15-756.02(A), and it created an “Office of English language acquisition services” to aid school districts in implementation of the models, §15-756.07(1). It also required the state board of education to institute a uniform and mandatory training program for all SEI instructors. § 15-756.09.
Research on ELL instruction indicates there is documented, academic support for the view that SEI is signifi *461 cantly more effective than bilingual education.[10] Findings of the Arizona State Department of Education in 2004 strongly support this conclusion.[11] In light of this, a proper analysis of petitioners’ Rule 60(b)(5) motion should include further factual findings regarding whether Nogales’ implementation of SEI methodology — completed in all of its schools by 2005 — constitutes a “significantly changed circumstance” that warrants relief.
2
Congress’ enactment of NCLB represents another potentially significant “changed circumstance.” NCLB marked a dramatic shift in federal education policy. It reflects Congress’ judgment that the best way to raise the level of education nationwide is by granting state and local officials flexibility to develop and implement educational programs that address local needs, while holding them accountable for the results. NCLB implements this approach by requiring States receiving federal funds to define performance standards and to make regular assessments of progress toward the attainment of those standards. 20 U. S. C. § 6311(b)(2). NCLB conditions the continued receipt of funds on demonstrations of “adequate yearly progress.” Ibid.
*462 As relevant here, Title III (which includes the English Language Acquisition, Language Enhancement, and Academic Achievement Act) requires States to ensure that ELL students “attain English proficiency, develop high levels of academic attainment in English, and meet the same challenging State academic content and student academic achievement standards as all children are expected to meet.” § 6812(1). It requires States to set annual objective achievement goals for the number of students who will annually progress toward proficiency, achieve proficiency, and make “adequate yearly progress” with respect to academic achievement, § 6842(a), and it holds local schools and agencies accountable for meeting these objectives, § 6842(b).
Petitioners argue that through compliance with NCLB, the State has established compliance with the EEOA. They note that when a State adopts a compliance plan under NCLB — as the State of Arizona has — it must provide adequate assurances that ELL students will receive assistance “to achieve at high levels in the core academic subjects so that those children can meet the same . . . standards as all children are expected to meet.” § 6812(2). They argue that when the Federal Department of Education approves a State’s plan — as it has with respect to Arizona’s — it offers definitive evidence that the State has taken “appropriate action to overcome language barriers” within the meaning of the EEOA. § 1703(f).
The Court of Appeals concluded, and we agree, that because of significant differences in the two statutory schemes, compliance with NCLB will not necessarily constitute “appropriate action” under the EEOA. 516 F. 3d, at 1172-1176. Approval of an NCLB plan does not entail substantive review of a State’s ELL programming or a determination that the programming results in equal educational opportunity for ELL students. See §6823. Moreover, NCLB contains a saving clause, which provides that “[njothing in this part shall be construed in a manner inconsistent with any Federal law guaranteeing a civil right.” § 6847.
*463 This does not mean, however, that NCLB is not relevant to petitioners’ Rule 60(b)(5) motion. To the contrary, we think it is probative in four principal ways.[12] First, it prompted the State to institute significant structural and programming changes in its delivery of ELL education,[13] leading the Court of Appeals to observe that “Arizona has significantly improved its ELL infrastructure.” 516 F. 3d, at 1154. These changes should not be discounted in the Rule 60(b)(5) analysis solely because they do not require or result from increased funding. Second, NCLB significantly increased federal funding for education in general and ELL programming in particular.[14] These funds should not be disregarded just because they are not state funds. Third, through its assessment and reporting requirements, NCLB *464 provides evidence of the progress and achievement of No-gales’ ELL students.[15] This evidence could provide persuasive evidence of the current effectiveness of Nogales’ ELL programming.[16]
Fourth and finally, NCLB marks a shift in federal education policy. See Brief for Petitioner Speaker of the Arizona House of Representatives et al. 7-16. NCLB grants States “flexibility” to adopt ELL programs they believe are “most effective for teaching English.” §6812(9). Reflecting a growing consensus in education research that increased funding alone does not improve student achievement,[17] *465 NCLB expressly refrains from dictating funding levels. Instead, it focuses on the demonstrated progress of students through accountability reforms.[18] The original declaratory judgment order, in contrast, withdraws the authority of state and local officials to fund and implement ELL programs that best suit Nogales’ needs, and measures effective programming solely in terms of adequate incremental funding. This conflict with Congress’ determination of federal policy may constitute a significantly changed circumstance, warranting relief. See Railway Employees v. Wright, 364 U. S. 642, 651 (1961) (noting that a court decree should be modified when “a change in law brings [the decree] in conflict with statutory objectives”).
3
Structural and management reforms in Nogales constitute another relevant change in circumstances. These reforms *466 were led by Kelt Cooper, the Nogales superintendent from 2000 to 2005, who “adopted policies that ameliorated or eliminated many of the most glaring inadequacies discussed by the district court.” 516 F. 3d, at 1156. Among other things,, Cooper “reduce[d] class sizes,” “significantly improv[ed] student/teacher ratios,” “improved teacher quality,” “pioneered a uniform system of textbook and curriculum planning,” and “largely eliminated what had been a severe shortage of instructional materials.” Id., at 1156-1157. The Court of Appeals recognized that by “[u]sing careful financial management and applying for ‘all funds available,’ Cooper was able to achieve his reforms with limited resources.” Id., at 1157. But the Court of Appeals missed the legal import of this observation — that these reforms might have brought Nogales’ ELL programming into compliance with the EEOA even without sufficient ELL incremental funding to satisfy the District Court’s original order. Instead, the Court of Appeals concluded that to credit Cooper’s reforms would “penaliz[e]” Nogales “for doing its best to make do, despite Arizona’s failure to comply with the terms of the judgment,” and would “absolve the state from providing adequate ELL incremental funding as required by the judgment.” Id., at 1168. The District Court similarly discounted Cooper’s achievements, acknowledging that Nogales was “doing substantially better than it was in 2000,” but concluding that because the progress resulted from management efforts rather than increased funding, its progress was “fleeting at best.” 480 F. Supp. 2d, at 1160.
Entrenched in the framework of incremental funding, both courts refused to consider that Nogales could be taking .“appropriate action” to address language barriers even without having satisfied the original order. This was error. The EEOA seeks to provide “equal educational opportunity” to “all children enrolled in public schools.” § 1701(a). Its ultimate focus is on the quality of educational programming and *467 services provided to students, not the amount of money-spent on them. Accordingly, there is no statutory basis for precluding petitioners from showing that Nogales has achieved EEOA-compliant programming by means other than increased funding — for example, through Cooper’s structural, curricular, and accountability-based reforms. The weight of research suggests that these types of local reforms, much more than court-imposed funding mandates, lead to improved educational opportunities.[19] Cooper even testified that, without the structural changes he imposed, “additional money” would not “have made any difference to th[e] students” in Nogales. Addendum to Reply Brief for Petitioner Speaker of the Arizona House of Representatives et al. 15.
The Court of Appeals discounted Cooper’s reforms for other reasons as well. It explained that while they “did ameliorate many of the specific examples of resource shortages that the district court identified in 2000,” they did not “result in such success as to call into serious question [No-gales’] need for increased incremental funds.” 516 F. 3d, at 1169. Among other things, the Court of Appeals referred to “the persistent achievement gaps documented in [Nogales’] AIMS test data” between ELL students and native speakers, id, at 1170, but any such comparison must take into account other variables that may explain the gap. In any event, the EEOA requires “appropriate action” to remove language barriers, § 1703(f), not the equalization of results between native and nonnative speakers on tests administered in English — a worthy goal, to be sure, but one that may be exceedingly difficult to achieve, especially for older ELL students.
*468 The Court of Appeals also referred to the subpar performance of Nogales’ high schools. There is no doubt that No-gales’ high schools represent an area of weakness, but the District Court made insufficient factual findings to support a conclusion that the high schools’ problems stem from a failure to take “appropriate action,” and constitute a violation of the EEOA.[20]
The EEOA’s “appropriate action” requirement grants States broad latitude to design, fund, and implement ELL programs that suit local needs and account for local conditions. A proper Rule 60(b)(5) inquiry should recognize this and should ask whether, as a result of structural and managerial improvements, Nogales is now providing equal educational opportunities to ELL students.
4
A fourth potentially important change is an overall increase in the education funding available in Nogales. The original declaratory judgment order noted five sources of funding that collectively financed education in the State: (1) the State’s “base level” funding, (2) ELL incremental funding, (3) federal grants, (4) regular district and county taxes, and (5) special voter-approved district and county taxes called “overrides.” 172 F. Supp. 2d, at 1227. All five sources have notably increased since 2000.[21] Nbtwithstand *469 ing these increases, the Court of Appeals rejected petitioners’ claim that overall education funds were sufficient to support EEOA-compliant programming in Nogales. The court reasoned that diverting base-level education funds would necessarily hurt other state educational programs, and was not, therefore, an “‘appropriate’ step.” 516 F. 3d, at 1171. In so doing, it foreclosed the possibility that petitioners could establish changed circumstances warranting relief through an overall increase in education funding available in Nogales.
This was clear legal error. As we have noted, the EEOA’s “appropriate action” requirement does not necessarily require any particular level of funding, and to the extent that funding is relevant, the EEOA certainly does not require that the money come from any particular source. In addition, the EEOA plainly does not give the federal courts the authority to judge whether a State or a school district is providing “appropriate” instruction in other subjects. That remains the province of the States and the local schools. It is unfortunate if a school, in order to fund ELL programs, must divert money from other worthwhile programs, but such decisions fall outside the scope of the EEOA. Accordingly, the analysis of petitioners’ Rule 60(b)(5) motion should evaluate whether the State’s budget for general education funding, in addition to any local revenues,[22] is currently supporting EEOA-compliant ELL programming in Nogales.
Because the lower courts engaged in an inadequate Rule 60(b)(5) analysis, and because the District Court failed to make up-to-date factual findings, the analysis of the lower *470 courts was incomplete and inadequate with respect to all of the changed circumstances just noted. These changes are critical to a proper Rule 60(b)(5) analysis, however, as they may establish that Nogales is no longer in violation of the EEOA and, to the contrary, is taking “appropriate action” to remove language barriers in its schools. If this is the case, continued enforcement of the District Court’s original order is inequitable within the meaning of Rule 60(b)(5), and relief is warranted.
IV
We turn, finally, to the District Court’s entry of statewide relief.[23] The Nogales district, which is situated along the Mexican border, is one of 239 school districts in the State of Arizona. Nogales students make up about one-half of 1 percent of the entire State’s school population.[24] The record contains no factual findings or evidence that any school district other than Nogales failed (much less continues to fail) to provide equal educational opportunities to ELL students. See App. to Pet. for Cert. in No. 08-294, at 177a-l78a. Nor have respondents explained how the EEOA could justify a statewide injunction when the only violation claimed or *471 proved was limited to a single district. See Jenkins, 515 U. S., at 89-90; Milliken, 433 U. S., at 280. It is not even clear that the District Court had jurisdiction to issue a statewide injunction when it is not apparent that plaintiffs — a class of Nogales students and their parents — had standing to seek such relief.
The only , explanation proffered for the entry of statewide relief was based on an interpretation of the Arizona Constitution. We are told that the former attorney general “affirmatively urged a statewide remedy because a ‘Nogales only’ remedy would run afoul of the Arizona Constitution’s requirement of ‘a general and uniform public school system.’” Brief for Respondent Flores et al. 38 (quoting Ariz. Const., Art. 11, § 1(A); some internal quotation marks omitted).
This concern did not provide a valid basis for a statewide federal injunction. If the state attorney general believed that a federal injunction requiring increased ELL spending in one district necessitated, as a matter of state law, a similar increase in every other district in the State, the attorney general could have taken the matter to the state legislature or the state courts. But the attorney general did not do so. Even if she had, it is not clear what the result would have been. It is a question of state law, to be determined by state authorities, whether the equal funding provision of the Arizona Constitution would require a statewide funding increase to match Nogales’ ELL funding, or would leave Nogales as a federally compelled exception. By failing to recognize this, and by entering a statewide injunction that intruded deeply into the State’s budgetary processes based solely on the attorney general’s interpretation of state law, the District Court obscured accountability for the drastic remedy that it entered.
When it is unclear whether an onerous obligation is the work of the Federal or State Government, accountability is diminished. See New York v. United States, 505 U. S. 144, *472 169 (1992). Here, the District Court “improperly prevented] the citizens of the State from addressing the issue [of statewide relief] through the processes provided by the State’s constitution.” Hawaii v. Office of Hawaiian Affairs, 556 U. S. 163, 176-177 (2009). Assuming that petitioners, on remand, press their objection to the statewide extension of the remedy, the District Court should vacate the injunction insofar as it extends beyond Nogales unless the court concludes that Arizona is violating the EEOA on a statewide basis.
There is no question that the goal of the EEOA — overcoming language barriers — is a vitally important one, and our decision will not in any way undermine efforts to achieve that goal. If petitioners are ultimately granted relief from the judgment, it will be because they have shown that the Nogales School District is doing exactly what this statute requires — taking “appropriate action” to teach English to students who grew up speaking another language.
* * *
We reverse the judgment of the Court of Appeals and remand the cases for the District Court to determine whether, in accordance with the standards set out in this opinion, petitioners should be granted relief from the judgment. .

It is so ordered.

 We have previously held that Congress may validly abrogate the States’ sovereign immunity only by doing so (1) unequivocally and (2) pursuant to certain valid grants of constitutional authority. See, e. g., Kimel v. Florida Bd. of Regents, 528 U. S. 62, 73 (2000). With respect to the second requirement, we have held that statutes enacted pursuant to § 5 of the Fourteenth Amendment must provide a remedy that is “congruent and proportional” to the injury that Congress intended to address. See City of Boerne v. Flores, 521 U. S. 507, 520 (1997). Prior to City of Boerne, the Court of Appeals for the Ninth Circuit held that the EEOA, which was enacted pursuant to § 5 of the Fourteenth Amendment, see 20 U. S. C. §§ 1702(a)(1), (b), validly abrogates the States’ sovereign immunity. See Los Angeles Branch NAACP v. Los Angeles Unified School Dish, 714 F. 2d 946, 950-951 (1983); see also Flores v. Arizona, 516 F. 3d 1140, 1146, n. 2 (CA9 2008) (relying on Los Angeles NAACP). That issue is not before us in these cases.

 We do not agree with the conclusion of the Court of Appeals that “the Superintendent’s standing is limited” to seeking vacatur of the District Court’s orders “only as they run against him.” 516 F. 3d, at 1165. Had the superintendent sought relief based on satisfaction of the judgment, the Court of Appeals’ conclusion might have been correct. But as discussed infra, at 453, petitioners’ Rule 60(b)(5) claim is not based on satisfaction of the judgment. Their claim is that continued enforcement of the District Court’s orders would be inequitable. This claim implicates the orders in their entirety, and not solely as they run against the superintendent.

 The dissent is quite wrong in contending that these are not institutional reform eases because they involve a statutory, rather than a constitutional, claim and because the orders of the District Court do not micromanage the day-to-day operation of the schools. Post, at 496 (opinion of Breyer, J.). For nearly a decade, the orders of a Federal District Court have substantially restricted the ability of the State of Arizona to make basic decisions regarding educational policy, appropriations, and budget priorities. The record strongly suggests that some state officials have welcomed the involvement of the federal court as a means of achieving appropriations objectives that could not be achieved through the ordinary democratic process. See supra, at 443. Because of these features, these cases implicate all of the unique features and risks of institutional reform litigation.

 The dissent conveniently dismisses the Court of Appeals’ statements by characterizing any error that exists as “one of tone, not of law,” and by characterizing our discussion as reading them out of context. Post, at 510-511. But we do read these statements in context — in the context of the Court of Appeals’ overall treatment of petitioners’ Rule 60(b)(5) arguments — and it is apparent that they accurately reflect the Court of Appeals’ excessively narrow understanding of the role of Rule 60(b)(5).

 This does not mean, as the dissent misleadingly suggests, see post, at 492-493, that we are faulting the Court of Appeals for declining to decide whether the District Court’s original order was correct in the first place. On the contrary, as we state explicitly in the paragraph following this statement, our criticism is that the Court of Appeals did not engage in the changed-circumstances inquiry prescribed by Rufo v. Inmates of Suffolk County Jail, 502 U. S. 367 (1992). By focusing excessively on the issue of incremental funding, the Court of Appeals was not true to the Rufo standard.

 In addition to concluding that the law’s increase in incremental funding was insufficient and that 2-year cutoff was irrational, both the District Court and the Court of Appeals held that HB 2064’s funding mechanism violates NCLB, which provides in relevant part: “A State shall not take into consideration payments under this chapter ... in determining the eligibility of any local educational agency in that State for State aid, or the amount of State aid, with respect to free public education of children.” 20 U.S.C. §7902. See 480 F. Supp. 2d, at 1166 (HB 2064’s funding mechanism is “absolutely forbidden” by § 7902); 516 F. 3d, at 1178 (“HB 2064 . .. violates [§ 7902] on its face”). Whether or not HB 2064 violates § 7902, see Brief for United States as Amicus Curiae 31-32, and n. 8 (suggesting it does), neither court below was empowered to decide the issue. As the Court of Appeals itself recognized, NCLB does not provide a private right of action. See 516 F. 3d, at 1175. “Without [statutory intent], a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.” Alexander v. Sandoval, 532 U. S. 275, 286-287 (2001). Thus, NCLB is enforceable only by the agency charged with administering it. See id., at 289-290; see also App. to Brief for Respondent State of Arizona et al. 1-4 (letter from U. S. Department of Education to petitioner superintendent concerning the legality vel non of HB 2064).

 The extent to which the dissent repeats the errors of the courts below is evident in its statement that “[t]he question here is whether the State has shown that its new funding program amounts to a ‘change’ that satisfies subsection (f)’s requirement.” Post, at 510 (emphasis added). The proper inquiry is not limited to the issue of funding. Rather, it encompasses the question whether the State has shown any factual or legal changes that establish compliance with the EEOA.

 The dissent cites two sources for this proposition. The first — Castaneda v. Pickard, 648 F. 2d 989 (CA5 1981) — sets out a three-part test for “appropriate action.” Under that test, a State must (1) formulate a sound English language instruction educational plan, (2) implement that plan, and (3) achieve adequate results. See id., at 1009-1010. Whether or not this test provides much concrete guidance regarding the meaning of “appropriate action,” the test does not focus on incremental funding or on the provision of resources more generally.
The second source cited by the dissent — curiously—is a speech given by President Nixon in which he urged prompt action by Congress on legislation imposing a moratorium on new busing orders and on the Equal Educational Opportunities Act of 1972. See post, at 484 (citing Address to the Nation on Equal Educational Opportunity and Busing, 8 Weekly Comp, of Pres. Doc. 590, 591 (1972)). In the speech, President Nixon said that schools in poor neighborhoods should receive the “financial support . . . that we know can make all the difference.” Id., at 593. It is likely that this statement had nothing to do with the interpretation of the EEOA’s “appropriate action” requirement and instead referred to his proposal to “direc[t] over $2½ billion in the next year mainly towards improving the education of children from poor families.” Id., at 591. But in any event, this general statement, made in a Presidential speech two years prior *459 to the enactment of the EEOA, surely sheds little light on the proper interpretation of the statute.

 By focusing on the adequacy of HB 2064’s funding provisions, the courts below neglected to address adequately the potential relevance of these programming provisions, which became effective immediately upon enactment of the law.

 See Brief for American Unity Legal Defense Fund et al. as Amici Curiae 10-12 (citing sources, including New York City Board of Education, Educational Progress of Students in Bilingual and ESL Programs: a Longitudinal Study, 1990-1994 (1994); 2 K. Torrance, Immersion Not Submersion: Lessons From Three California Districts’ Switch From Bilingual Education to Structured Immersion 4 (2006)).

 See Ariz. Dept. of Ed., The Effects of Bilingual Education Programs and Structured English Immersion Programs on Student Achievement: A Large-Scale Comparison 3 (Draft July 2004) (“In the general statewide comparison of bilingual and SEI programs [in 2002-2003], those students in SEI programs significantly outperformed bilingual students in 24 out of 24 comparisons .... Though students in SEI and bilingual programs are no more than three months apart in the primary grades, bilingual students are more than a year behind their SEI counterparts in seventh and eighth grade”).

 Although the dissent contends that the sole argument raised below regarding NCLB was that compliance with that Act necessarily constituted compliance with the EEOA, the Court of Appeals recognized that NCLB is a relevant factor that should be considered under Rule 60(b)(5). It acknowledged that compliance with NCLB is at least “somewhat probative” of compliance with the EEOA. 516 F. 3d, at 1175, n. 46. The United States, in its brief as amicus curiae supporting respondents, similarly observed that, “[e]ven though Title III participation is not a complete defense under the EEOA, whether a State is reaching its own goals under Title III may be relevant in an EEOA suit.” Brief for United States 24. And the District Court noted that, “[b]y increasing the standards of accountability, [NCLB] has to some extent significantly changed State educators approach to educating students in Arizona.” Flores v. Arizona, 480 F. Supp. 2d 1157, 1160-1161 (Ariz. 2007).

 Among other things, the state department of education formulated a compliance plan, approved by the U. S. Department of Education. The state board of education promulgated statewide ELL proficiency standards, adopted uniform assessment standards, and initiated programs for monitoring school districts and training structured English immersion teachers. See 516 F. 3d, at 1154; see also Reply Brief for Petitioner Superintendent 29-31.

 See Brief for Petitioner Superintendent 22, n. 13 (“At [Nogales], Title I monies increased from $1,644,029.00 in 2000 to $3,074,587.00 in 2006, Title II monies increased from $216,000.00 in 2000 to $466,996.00 in 2006, and Title III monies, which did not exist in 2000, increased from $261,818.00 in 2003 to $322,900.00 in 2006”).

 See, e. g., App. to Pet. for Cert. in No. 08-289, pp. 310-311 (2005-2006 testing data for ELL students, reclassified ELL students, and non-ELL students on statewide achievement tests); id., at 312 (2005-2006 data regarding Nogales’ achievement of the State’s annual measurable accountability objectives for ELL students).

 The Court of Appeals interpreted the testing data in the record to weigh against a finding of effective programming in Nogales. See 516 F. 3d, at 1157 (noting that “[t]he limits of [Nogales’] progress... are apparent in the AIMS test results and reclassification test results”); id., at 1169-1170 (citing “the persistent achievement gaps documented in [Nogales’] AIMS test data” between ELL students and native speakers). We do not think the District Court made sufficient factual findings to support its conclusions about the effectiveness of Nogales’ ELL programming, and we question the Court of Appeals’ interpretation of the data for three reasons. First, as the Court of Appeals recognized, the absence of longitudinal data in the record precludes useful comparisons. See id., at 1155. Second, the AIM'S tests — the statewide achievement tests on which the Court of Appeals primarily relied and to which the dissent cites in Appendix A of its opinion — are administered in English. It is inevitable that ELL students (who, by definition, are not yet proficient in English) will underperform as compared to native speakers. Third, the negative data that the Court of Appeals highlights is balanced by positive data. See, e. g., App. 97 (reporting that for the 2005-2006 school year, on average, reclassified students did as well as, if not better than, native English speakers on the AIMS tests).

 See, e. g., Hanushek, The Failure of Input-Based Schooling Policies, 113 Economic J. F64, F69 (Feb. 2003) (reviewing U. S. data regarding “input policies” and concluding that although such policies “have been vigorously pursued over a long period of time,” there is “no evidence that *465 the added resources have improved student performance”); A. LeFevre, American Legislative Exchange Council, Report Card on American Education: A State-by-State Analysis 132-133 (15th ed. 2008) (concluding that spending levels alone do not explain differences in student achievement); G. Burtless, Introduction and Summary, in Does Money Matter? The Effect of School Resources on Student Achievement and Adult Success 1, 5 (1996) (noting that “[i]ncreased spending on school inputs has not led to notable gains in school performance”).

 Education literature overwhelmingly supports reliance on accountability-based reforms as opposed to pure increases in spending. See, e. g., Hanushek & Raymond, Does School Accountability Lead to Improved Student Performance? 24 J. Pol’y Analysis & Mgmt. 297, 298 (2005) (concluding that “the introduction of accountability systems into a state tends to lead to larger achievement growth than would have occurred without accountability”); U. S. Chamber of Commerce, Leaders and Laggards: A State-by-State Report Card on Educational Effectiveness 6, 7-10 (Feb. 2007) (discussing various factors other than inputs — such as a focus on academic standards and accountability — that have a significant impact on student achievement); S. Fuhrman, Introduction, in Redesigning Accountability Systems for Education 1, 3-9 (S. Fuhrman & R. Elmore eds. 2004); E. Hanushek et al., Making Schools Work: Improving Performance and Controlling Costs 151-176 (1994).

 See, e.g., Springer & Guthrie, Politicization of the School Finance Legal Process, in School Money Trials 102, 121 (M. West & P. Peterson eds. 2007); E. Hanushek & A. Lindseth, Schoolhouses, Courthouses, and Statehouses: Solving the Funding-Achievement Puzzle in America’s Public Schools 146 (2009).

 There are many possible causes for the performance of students in Nogales’ high school ELL programs. These include the difficulty of teaching English to older students (many of whom, presumably, were not in English-speaking schools as younger students) and problems such as drug use and the prevalence of gangs. See Reply Brief for Petitioner Speaker of the Arizona House of Representatives et al. 14-15; Reply Brief for Petitioner Superintendent 16-17; App. 116-118. We’ note that no court has made particularized findings as to the effectiveness of ELL programming offered at Nogales’ high schools.

 The Court of Appeals reported, and it is not disputed, that “[o]n an inflation-adjusted statewide basis, including all sources of funding, support for education has increased from $8,139 per pupil in 2000 to an estimated *469 $3,570 per pupil in 2006; Adding in all county and local sources, funding has gone from $5,677 per pupil in 2000 to an estimated $6,412 per pupil in 2006. Finally, federal funding has increased. In 2000, the federal government provided an additional $526 per pupil; in 2006, it provided an estimated $953.” 516 F. 3d, at 1155.

 Each year since 2000, Nogales voters have passed an override. Revenues from Nogales’ override have increased from $895,891 in 2001 to $1,674,407 in 2007. App. to Pet.,for Cert. in No. 08-294, p. 431a.

 The dissent contends that this issue was not raised below, but what is important for present purposes is that, for the reasons explained in the previous parts of this opinion, these cases must be remanded to the District Court for a proper Rule 60(b)(5) analysis. Petitioners made it clear at oral argument that they wish to argue that the extension of the remedy to districts other than Nogales should be vacated. See Tr. of Oral Arg. 68 (“Here the EEOA has been transmogrified to apply statewide. That has not been done before. It should not have been done in the first instance but certainly in light of the changed circumstances”); see also id., at 17-18, 21, 26. Accordingly, if petitioners raise that argument on remand, the District Court must consider whether there is any legal or factual basis for denying that relief.

 See Ariz. Dept. of Ed., Research and Evaluation Section, 2008-2009 October Enrollment by School, District and Grade 1, 17, http://www.ade.state.az.us/researchpolicy/AZEnroll/2008-2009/Octenroll2009schoolbygrade.pdf (as visited June 18, 2009, and available in Clerk of Court’s case file).