In the

# United States Court of Appeals
## For the Seventh Circuit

No. 20-1828

MICHAEL SHAKMAN, *et al.*,

*Plaintiffs-Appellees*,

*v.*

CLERK OF COOK COUNTY,

*Defendant-Appellant*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:69-cv-02145 — **Sidney I. Schenkier**, *Magistrate Judge*.

ARGUED NOVEMBER 10, 2020 — DECIDED APRIL 16, 2021

Before EASTERBROOK, KANNE, and SCUDDER, *Circuit Judges*.

SCUDDER, *Circuit Judge*. This appeal returns us to consent decrees—the so-called Shakman Decrees—entered in 1972 and 1991 to monitor political patronage practices in Chicago. The Clerk of Cook County remains subject to the Consent Decrees to this day. Before us is the Clerk's appeal from a decision finding recent violations of the Consent Decrees, appointing a special master to monitor the Clerk's future compliance, and refusing the Clerk's request to vacate the

Decrees. While we lack authority to review the appointment of the special master, we affirm the denial of the Clerk's request to vacate.

Though we affirm, we sound a federalism concern. This matter has languished in the federal courts for a long time—indeed, as best we can tell, for decades with little to no meaningful activity. Permitting a consent decree over an arm of state or local government (here, the Cook County Clerk) to anchor itself on a federal docket for decades is inconsistent with our federal structure. Diligence, not dormancy, must mark the path forward.

## I

### A

The Shakman Decrees date to 1972, and their history and twists and turns over the years have consumed many pages of the Federal Reporter. See, *e.g.*, *Shakman v. Democratic Org. of Cook County*, 435 F.2d 267 (7th Cir. 1970) ("*Shakman I*"); *Shakman v. Dunne*, 829 F.2d 1387 (7th Cir. 1987) ("*Shakman II*"). We need recount only the essential facts.

Decades ago, Michael Shakman, an independent candidate seeking a delegate position at the 1970 Illinois constitutional convention, grew concerned that Chicago politicians influenced elections through patronage in public employment. He feared that elected officials were promising and awarding jobs in local government in exchange for pledges of political support. Unable and unwilling to engage in these practices, Shakman felt disadvantaged. He questioned how he could attract voters, recruit volunteers, and raise campaign money with as much success as incumbent candidates who engaged in these patronage practices.

Shakman sought to level the playing field through litigation. In 1969 he and Paul Lurie, a political supporter, filed a complaint on behalf of independent candidates and voters in the Northern District of Illinois. Shakman alleged that city and county officials and arms of municipal government—including the Clerk of Cook County, the Chicago Park District, the Chicago City Council, the Forest Preserve, and indeed Cook County itself—conditioned government employment on political patronage. He contended that the patronage practices violated the First and Fourteenth Amendments.

*Shakman I*: The putative class action struggled to get off the ground. In 1969 the district court dismissed Shakman's complaint for lack of standing, reasoning that the proper plaintiffs were not political candidates like Shakman but instead the actual government employees allegedly forced to engage in patronage. See *Shakman v. Democratic Org. of Cook County.*, 310 F. Supp. 1398 (N.D. Ill. 1969). We reversed, concluding that Shakman and the putative class members sought redress for injuries to their own interests—both "the interests of candidates in an equal chance" and "the interests of voters in having an equally effective voice." *Shakman I*, 435 F.2d at 270. We remanded and two years later the parties entered into the first of the Shakman Decrees. The 1972 Decree enjoined city and county officials from "conditioning, basing or knowingly prejudicing or affecting any term or aspect of governmental employment, with respect to one who is at the time already a governmental employee, upon or because of any political reason or factor." The Cook County Clerk remains subject to the 1972 Decree today.

*Shakman II*: After entering the 1972 Decree governing patronage with respect to current municipal employees, the district court retained jurisdiction to consider whether the prohibition on political patronage should extend to government hiring decisions. The district court answered in the affirmative and entered the 1983 Decree, which enjoined city and county officials from conditioning hiring or promotions on any political affiliation or considerations. See *Shakman v. Democratic Org. of Cook County*, 481 F. Supp. 1315, 1355 (N.D. Ill. 1979). Some parties consented to the 1983 Decree, while others, including the Cook County Clerk, appealed. The Clerk argued that the candidate and voter plaintiffs lacked standing to challenge municipal hiring policies. This time, we agreed. See *Shakman II*, 829 F.2d 1387. We saw the line of causation between alleged employment promises and Shakman's asserted political disadvantage as "particularly attenuated" and too dependent "upon countless individual decisions" of citizens engaging with the political process or hoping for government jobs. *Id.* at 1397. So the Clerk's office managed to shelter its hiring practices from the 1983 Decree.

*1991 Consent Decree*: A few years after *Shakman II*, the Supreme Court held that the First Amendment's prohibition against patronage-based firings recognized in *Elrod v. Burns*, 427 U.S. 347 (1976), "extends to promotion, transfer, recall, or hiring decisions involving public employment positions for which party affiliation is not an appropriate requirement." *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 68 (1990). Shakman and the other plaintiffs reacted to *Rutan* by moving anew to extend the 1983 Decree to the Cook County Clerk. All of this led in 1991 to the Clerk consenting to a separate consent decree with prohibitions akin to those included in the 1983 Decree. The resulting 1991 Decree requires, among other

conditions, that officials post "prior public notice of the opportunity to apply for and be hired for" all positions beyond a few specified exempt roles.

B

A couple of additional points set the stage for this appeal. In 1992 the Independent Voters of Illinois-Independent Precinct Organization—which we will call the Voters Organization for simplicity—entered the litigation when it joined the first amended complaint filed by Shakman and the other plaintiffs. The new complaint explained that the Voters Organization "is an Illinois political organization which endorses and supports candidates for public office both in party primary and general elections, especially in Cook County, Illinois." Patronage practices, the amended complaint alleged, harm the Voters Organization and its members who are independent candidates, voters, and current public employees.

And just as new plaintiffs have joined the case since 1991, the district court has found that some entities and officials, like the City of Chicago and the Chicago Park District, demonstrated substantial compliance with the Decrees. So those parties have been dismissed.

In 2010 the Clerk of Cook County and other defendants consented to a magistrate judge conducting any further proceedings in the case. See 28 U.S.C. § 636(c). The assigned magistrate oversaw the case for a decade before retiring in 2020. At that point the Governor of Illinois, as one of the parties to the Consent Decrees, objected to the reassignment of a new magistrate judge and observed that a new district judge also needed to be appointed given the retirement many years ago of the assigned district judge. The Governor's objection

resulted in the assignment of a new district judge and a new magistrate judge. See N.D. Il. Local Rule 73.1(a) (delineating the procedures for assigning magistrate judges). No party has objected to the reassignment or raised any other argument regarding the recession of the prior consent to proceed before a magistrate judge. The multiple judicial retirements and subsequent shufflings late last year are indicative of just how long this case has burdened the federal docket.

With this background in place, we consider the Clerk's appeal from the magistrate judge's decision to appoint a special master and to decline to vacate the Consent Decrees.

## II

Though the Cook County Clerk remains subject to the 1972 and 1991 Decrees, the case appears to have sat dormant on the federal docket for the last 30 to 40 years. No plaintiff has ever challenged the Clerk's compliance. Nor has the Clerk ever sought to terminate or modify the Decrees. The case came back to life for the Clerk in 2019, however, when Michael Shakman, the Voters Organization, and the other plaintiffs moved for supplemental relief.

It was then that these plaintiffs moved for the appointment of a special master to monitor the Clerk's compliance with the Consent Decrees. The plaintiffs asserted that the Clerk's hiring practices violate provisions of the 1991 Decree and that employees who choose to remain apolitical suffer workplace setbacks and discrimination, in violation of the 1972 Decree. Right to it, the plaintiffs contended that the Clerk unilaterally changed the list of political positions exempt from hiring oversight, hired new employees for non-exempt positions without publicly posting the openings, and

punished independent employees with disfavored job assignment rotation programs.

The Clerk opposed the plaintiffs' request for appointment of a special master, characterizing the alleged violations as technical and trivial. The Clerk also went on the offensive by asking the magistrate judge to vacate the 1972 and 1991 Consent Decrees. Though the Clerk never filed a separate motion to vacate, the magistrate treated the Clerk's response in opposition to the plaintiff's motion for supplemental relief as a motion to vacate pursuant to Federal Rule of Civil Procedure 60(b)(5).

Limited discovery followed, and after a three-day evidentiary hearing in March 2020, the magistrate judge found that the Clerk violated the 1991 Decree. The magistrate likewise found that the evidence strongly suggested that the Clerk's policy of rotating employees between offices was "instituted for the purpose of making life miserable" for certain long-time supervisors who did not come from "political pedigree[s]," in violation of the 1972 Decree. To provide a remedy and "to lay the groundwork for the day when those [Decrees] should indeed be vacated," the magistrate invoked Federal Rule of Civil Procedure 53 and appointed a special master to oversee compliance within the Clerk's Office.

Along the way, the magistrate judge concluded that all existing plaintiffs continue to have Article III standing. The magistrate likewise ruled that nothing about the Supreme Court's 2019 decision in *Rucho v. Common Cause*, 139 S. Ct. 2484, shows that continued enforcement of the Consent Decrees presents a non-justiciable political question, or that the time has come to vacate the Consent Decrees as to the Clerk.

The Clerk now appeals.

## III

We begin with two threshold questions of appellate jurisdiction. Most often our jurisdiction comes from 28 U.S.C. § 1291, which authorizes the courts of appeals to review the "final decisions" of the district courts. But we also have jurisdiction to review narrow categories of interlocutory orders, including those "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." 28 U.S.C. § 1292(a)(1). Michael Shakman, the Voters Organization, and the other plaintiffs question our jurisdiction to review the magistrate judge's decisions to appoint a special master and to decline to vacate the Decrees. The plaintiffs have it half right.

## A

We agree that we lack jurisdiction to review the magistrate judge's decision to appoint a special master. Enlisting the assistance of a special master is a tool district courts may use to help resolve ongoing disputes. The appointment does not terminate the litigation, however, and is thus not a final judgment appealable under § 1291. See *Riley v. Kennedy*, 553 U.S. 406, 419 (2008) (defining a final judgment as "one which ends the litigation on the merits and leaves nothing for the court to do"); see also *Bogard v. Wright*, 159 F.3d 1060, 1062 (7th Cir. 1998) (determining that the extension of a special master's term is not an appealable final judgment under § 1291). Nor does § 1292(a)(1) provide us jurisdiction, as "[t]he appointment of a special master" is a procedural order, and "procedural orders, though they often have the form of an

injunction, are not classified as injunctions for purposes of section 1292(a)(1)." *Bogard*, 159 F.3d at 1063.

The Clerk invokes the Fifth Circuit's 1979 decision in *Gary W. v. State of Louisiana*, 601 F.2d 240, and urges a narrower reading of *Bogard*, emphasizing that the district court there only extended the term of a special master, whereas the magistrate judge here appointed a master in the first instance. The initial appointment here, the Clerk explains, reflects the modification of an injunction appealable under 28 U.S.C. § 1292(a)(1).

While we see the distinction, it does not make a difference in the circumstances before us. The appointment of a special master did not amount to the modification of the Consent Decrees, but instead reflected the magistrate judge's invocation of a procedural tool to help monitor the parties' compliance with the existing requirements of the Decrees. And while the appointment order authorizes the special master to implement certain provisions of the Decrees (for example, the development of the exempt position list), the substance of the Decrees' terms and conditions did not change. On these facts, we see the special master acting only as an arm of the court to help address "posttrial matters that cannot be effectively and timely addressed" by the assigned judge. FED. R. CIV. P. 53(a)(1)(C).

In so concluding, we do not rule-out that the appointment of a special master in other facts and circumstances might amount to a modification of a consent decree reviewable on appeal. Here, however, we lack appellate jurisdiction to review the magistrate's decision to appoint a special master under § 1292(a)(1).

B

But we do have jurisdiction to review the magistrate judge's decision denying the Clerk's request to vacate the Consent Decrees. See *id.* at 1064–65 (explaining that the denial of a motion to modify a consent decree under Rule 60(b) is "appealable under section 1292(a)(1)").

Shakman and the other plaintiffs emphasize that the Clerk never filed a Rule 60(b)(5) motion before the magistrate. This failure, they press, deprives us of appellate jurisdiction. While mistaken in their ultimate conclusion, the plaintiffs are surely right to criticize the Clerk for not invoking Rule 60(b) and formally filing a motion seeking to vacate the 1972 and 1991 Consent Decrees. Rule 60(b)(5), by its terms, authorizes district courts to provide relief from orders—including, as applied here, consent decrees—where the prior judgment or order has been satisfied or where prospective application is no longer equitable. Rather than invoking Rule 60(b)(5) in its brief in opposition to the plaintiffs' request for supplemental relief, the Clerk should have filed a formal motion under the Rule. Not doing so created an entirely avoidable issue on appeal. The rules of appellate jurisdiction are meant to apply mechanically—not loosely or casually—as formal applications make the exercise of jurisdiction more efficient and predictable. Proper motions are preferred eight days a week over the kind of functional, close-enough request the Clerk saw as adequate here.

The Clerk's error does not deprive us of appellate jurisdiction, however. The record is clear that the magistrate judge understood and declined the Clerk's request to vacate the Consent Decrees. The Clerk and the plaintiffs structured their arguments around Rule 60(b)(5), and the magistrate's order

concludes that the time has not "come for the [Decrees] to be vacated as to the County Clerk *under Rule 60(b)(5)*." In so ruling, the magistrate declined the Clerk's request to vacate the ongoing application of the Consent Decrees. Our jurisdiction is therefore secure under § 1292(a)(1).

## IV

We come, then, to the magistrate judge's decision to leave the 1972 and 1991 Consent Decrees in place. Rule 60(b)(5) authorizes the district court, "on motion and just terms," to relieve from a consent decree any party who demonstrates that "a significant change in facts or law warrants revision of the decree." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 393 (1992). We review a denial of a Rule 60(b)(5) motion for an abuse of discretion, adopting the court's factual findings unless clearly erroneous. See *Shakman v. City of Chicago*, 426 F.3d 925, 932 (7th Cir. 2005); FED. R. CIV. P. 52(a)(6).

The Clerk renews the same three positions it urged before the magistrate. *First*, the law of Article III standing has developed since the entry of the Decrees and no plaintiff has standing to enforce their provisions today. *Second*, political patronage presents nonjusticiable political questions akin to the one recognized by the Supreme Court in *Rucho v. Common Cause*. *Third*, the magistrate judge misunderstood the Clerk's alleged violations, which are merely technical and not cause for continued enforcement. We disagree on all fronts.

## A

The magistrate judge did not abuse his discretion in determining that developments in the law of standing since 1971 did not warrant vacating the Consent Decrees. The Clerk is correct that a Case or Controversy requires the existence, at

all stages of litigation, of a plaintiff who has suffered an injury in fact fairly traceable to the conduct of the Clerk and likely redressable by continued enforcement. See *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Where the Clerk falls short, though, is in demonstrating that, even though 50 years have passed since entry of the 1972 Decree, there is no longer any plaintiff with standing.

In *Shakman I*, we determined that plaintiff Michael Shakman and his political supporters—as a putative class of candidates and voters—had standing to seek redress for patronage in government employment. See 435 F.2d at 269. Our holding stemmed from the recognition that Shakman, unable and unwilling to engage in patronage himself, operated at a distinct disadvantage in the political sphere against incumbent candidates engaging in patronage practices. The 1972 Decree remains on the books and Shakman continues to press for its enforcement. This appeal presents no occasion to revisit our holding in *Shakman I*.

The 1991 Decree governing hiring decisions requires a more in-depth analysis, owing in part to our holding in *Shakman II* that candidate and voter plaintiffs lacked standing because they could not demonstrate that they suffered an injury fairly traceable to municipal *hiring* practices. See 829 F.2d at 1397. But remember that candidates and voters are not the only parties to the 1991 Decree. The Voters Organization joined the case as a plaintiff in 1992, and the magistrate judge determined that the Organization had associational standing to sue on behalf of its members, one of whom is a current employee in the Clerk's office. We agree.

An association has standing to bring suit on behalf of its members when any one of its members would have

individual standing to sue, the interests involved are germane to the organization's purpose, and neither the claim nor requested relief are of the type that would require individual member participation. See *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The Voters Organization meets each requirement.

At least one member of the Voters Organization, George Tserotas, presently works in the Clerk's office. Tserotas is subject to a job rotation because, as Shakman and the other plaintiffs explained in their request for appointment of a special master, he refuses to engage in political patronage. An employee who is subject to an adverse employment action because he refuses to endorse particular political views or support certain political candidates has suffered an injury redressable by the Consent Decrees to which the Clerk remains subject. See *Elrod*, 427 U.S. at 359–60. Put simply, Tserotas has an interest in a workplace free of patronage and has sustained or faced the threat of injury-in-fact. See *Hunt*, 432 U.S. at 343.

The record also confirms that elimination of political patronage—which the magistrate judge described as "a core principle of the [Voters Organization] since at least 1971"—is germane to the Voters Organization's mission. We see no error in this finding. See *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985). The Voters Organization focuses on maintaining election transparency and integrity by opposing solicitation of campaign contributions in public employment.

Finally, Michael Shakman, the Voters Organization, and the other plaintiffs sought injunctive relief and the appointment of a special master, neither of which requires proof of individual damages or otherwise demands participation of the Voters Organization's members. See *Hunt*, 432 U.S. at 343.

The Clerk argues to the contrary, pointing out that the magistrate judge did not approve the Voters Organization's request to amend the complaint and join as a plaintiff until 1992, the year *after* the 1991 Decree went into effect. A plaintiff who was not a party at the time the 1991 Decree became effective, the Clerk continues, cannot have standing. Not so.

The Voters Organization sought to join the litigation before the parties negotiated the 1991 Decree, and the magistrate judge held the request in abeyance. As the magistrate recognized, the Clerk was well aware that the Voters Organization intended to join the case. Even more, the Clerk never objected to the Voters Organization joining as a party. The 1991 Decree, by its terms, may be enforced by "any party." That the Voters Organization joined the case in 1992 does not alter our conclusion that it is a party with standing to enforce the 1991 Decree.

B

Even if standing presents no hurdle, the Clerk contends that the 1972 and 1991 Decrees must be vacated because they involve political questions not fit for resolution by a federal court. As the Clerk sees it, amorphous and judicially unmanageable concepts of political equality inevitably govern our review, and enforcement of the Consent Decrees is no longer equitable under Rule 60(b)(5). We see things differently.

The political question doctrine "identifies a class of questions that either are not amenable to judicial resolution because the relevant considerations are beyond the courts' capacity to gather and weigh" or are committed by the Constitution to the exclusive discretion of the legislative or executive branches of government. *Judge v. Quinn*, 624 F.3d 352, 358 (7th

Cir. 2010); see also *Baker v. Carr*, 369 U.S. 186, 217 (1962). In a recent application of these principles in the context of partisan gerrymandering, the Supreme Court explained that "[f]ederal judges have no license to reallocate political power between the two major political parties, with no plausible grant of authority in the Constitution, and no legal standards to limit and direct their decisions." *Rucho*, 139 S. Ct. at 2507.

The Clerk contends that the issues presented by the 1972 and 1991 Consent Decrees are analogous to those presented in *Rucho*. That analogy is flawed. In contrast to *Rucho*, both the legal right and applicable standard here are evident and judicially manageable. The Consent Decrees guard the freedom of association protected by the First Amendment. See *Elrod*, 427 U.S. at 355 ("The cost of the practice of patronage is the restraint it places on freedoms of belief and association."). An imposition on that freedom must be "narrowly tailored to further vital government interests." *Rutan*, 497 U.S. at 74. The magistrate judge did not abuse his discretion in concluding that ongoing enforcement of the Consent Decrees does not present nonjusticiable political questions.

C

A significant change in factual conditions may also warrant modification of a consent decree. See *Rufo*, 502 U.S. at 384. If a party complied in good faith and made a reasonable effort to conform its conduct, vacating a consent decree may be appropriate. But the magistrate judge found no such effort or record of compliance by the Clerk. To the contrary, the magistrate determined that the Clerk's ongoing violations reflect the precise political patronage the Consent Decrees seek to end. Here, too, we see no clear error in the magistrate's factual findings.

Take, for example, the provision in the 1991 Decree that lists which designated political positions within the Clerk's office may be filled without judicial oversight. The 1991 Decree authorizes changes to that list only with court approval. But the Clerk—without the magistrate's approval—unilaterally amended the list to include positions not otherwise exempt under the 1991 Decree. The magistrate reasonably concluded that the Clerk's doing so undermined the purpose of the exempt list: ensuring that political activity is considered in hiring only when politics are central to the potential employee's day-to-day work.

The Clerk's second violation is as straightforward as the first. The magistrate judge found that the Clerk violated the 1991 Decree by hiring employees for non-exempt positions without first providing public notice of open positions. This conduct allowed the Clerk to hire employees behind the scenes, away from the public accountability and oversight contemplated by the 1991 Decree. We see no error in the magistrate's finding that the Clerk "without question" violated this "unequivocal mandate."

The magistrate also doubted the Clerk's proffered justifications for its policy of rotating supervisors between offices, which seemed "calculated to maximize" the negative impact on employees. The magistrate found that the Clerk failed to offer evidence supporting its rationale for implementing the rotation practice, and underscored that employees exempted from the rotational requirement were politically well-connected. The magistrate underscored its "concern that the ill-fated rotation policy for supervisors" likely violated the 1972 Decree.

Each of the magistrate's determinations is rooted in evidence gathered over several days of hearings. The magistrate heard testimony from employees and supervisors and accepted over 100 exhibits into evidence. And it explained its rationale in a thorough 40-plus page opinion. The violations chronicled by the magistrate make clear that the Clerk of Cook County failed to demonstrate its compliance with the Consent Decrees. The magistrate did not abuse his discretion in denying the Clerk's motion to vacate the 1972 and 1991 Decrees under Rule 60(b)(5).

## V

Do not let today's result cloud the grave federalism concerns we have with the fact that the Clerk of Cook County has been under the thumb of a federal consent decree for the last 50 years. Such entrenched federal oversight should have raised red flags long ago.

As best we can tell from the more than 7,000 entries on the federal docket, the past 30 to 40 years have been defined by little more than the Clerk filing quarterly status reports. Our brief sampling of the reports shows that they followed the same template and over time seemed to take on a rote character. The docket contains few accompanying and responsive filings addressing the Clerk's compliance with the Consent Decrees and even fewer by the court. It is no exaggeration to say the Clerk's case has remained a fixture on the federal docket for over half a century.

Such stagnation is intolerable. Any federal consent decree is a very serious matter, and "[w]hatever may be the life expectancy of federal consent decrees, respect for the principle of separation of powers suggests that decrees imposing

obligations upon state institutions normally should be enforceable no longer than the need for them." *Kindred v. Duckworth*, 9 F.3d 638, 644 (7th Cir. 1993). Our federal structure, including the Article III Case or Controversy requirement, does not contemplate federal courts putting units of state or local government under what amount to static and permanent consent decrees. See *Frew v. Hawkins*, 540 U.S. 431, 442 (2004) (emphasizing the need to preserve the delicate balance between state and federal authority in the administration of consent decrees); *Horne v. Flores*, 557 U.S. 433, 448 (2009) ("[I]nstitutional reform injunctions often raise sensitive federalism concerns."). Federal injunctions interfere with local control over local decision making, and, in turn, local democracy does not work as our federal constitutional design envisions.

Federal courts, of course, remain open to adjudicate disputes between adverse parties and to remedy constitutional violations, including through the imposition of money damage awards. See, *e.g.*, 42 U.S.C. § 1983; see also *City of Los Angeles v. Lyons*, 461 U.S. 95, 113 (1983) (explaining that even where a federal court does not or cannot award injunctive relief, a plaintiff who "has suffered an injury barred by the Federal Constitution" will have "a remedy for damages under § 1983"). But federal courts are not here to oversee and monitor the hiring practices of municipal government for decades on end. See *Horne*, 557 U.S. at 450 ("If a federal consent decree is not limited to reasonable and necessary implementations of federal law, it may improperly deprive future officials of their designated legislative and executive powers." (quotation and brackets omitted)).

Over time, the Shakman Decrees have found a home on the docket of judge after judge in the Dirksen Courthouse. In

April 2020, the then-assigned magistrate judge determined that the objects of the Shakman Decrees have not been obtained as to the Clerk of Cook County. Today's decision does not upset that conclusion. But we trust—and expect—that the violations identified by the magistrate will be remedied with appropriate speed, and that, moving forward, all parties will work together to ensure swift compliance. It is time to get these cases off the federal docket, and all indications are that the newly assigned district judge shares the same objective.

For these reasons, we DISMISS the appeal of the magistrate judge's appointment of a special master for lack of jurisdiction, and we otherwise AFFIRM.