In the

# United States Court of Appeals
## For the Seventh Circuit

No. 21-1739

MICHAEL L. SHAKMAN and PAUL M. LURIE, individually and on behalf of others similarly situated,

*Plaintiffs-Appellees*,

*v.*

J.B. PRITZKER, in his official capacity as Governor of the State of Illinois,

*Defendant-Appellant*.

Appeal from the United States District Court for the Northern District of Illinois, Eastern Division.
No. 1:69-cv-02145 — **Edmond E. Chang**, *Judge*.

ARGUED DECEMBER 10, 2021 — DECIDED AUGUST 5, 2022

Before EASTERBROOK and SCUDDER, *Circuit Judges*.[*]

SCUDDER, *Circuit Judge*. In 1972 a federal district court entered the first of many consent decrees preventing the

---

[*]Circuit Judge Kanne died on June 16, 2022 and did not participate in the decision of this case, which is being resolved under 28 U.S.C. § 46(d) by a quorum of the panel.

Governor of Illinois and units of local government from con-
ditioning employment decisions on political patronage. And
so were born the Shakman decrees. The Governor remains
subject to the original 1972 decree to this day—50 years
later—despite having demonstrated substantial compliance
with its terms and objectives in recent years. Principles of fed-
eralism do not permit a federal court to oversee the Gover-
nor's employment practices for decades on end in circum-
stances like this. The power to hire, fire, and establish accom-
panying policies needs to return to the people of Illinois and
the Governor they elected. The federal courts will remain
open to decide individual cases of alleged constitutional vio-
lations should they arise. But no longer shall the Governor's
employment practices and policies have to win the approval
of a United States court.

## I

### A

The extensive history of the Shakman decrees is well doc-
umented. Indeed, the Federal Reporter contains six prior
opinions from our court detailing the decrees and the related
twists and turns over the last half century. An abbreviated re-
view of that history suffices this time around.

By the 1960s political patronage too often influenced pub-
lic employment decisions in Illinois, with state officials
awarding jobs based on who showed loyalty to the dominant
political party. In 1969, aiming to curb the corruption, inde-
pendent political candidate Michael Shakman and voter Paul
Lurie brought a putative class action against several political
organizations and various arms of county and city govern-
ment. They alleged that the conditioning of employment

opportunities on campaign contributions and pledged votes prevented the election of independent candidates and violated the First, Fifth, and Fourteenth Amendments.

In 1970 we reversed the district court's dismissal of the case. See *Shakman v. Democratic Org. of Cook County*, 435 F.2d 267 (7th Cir. 1970) ("*Shakman I*"). The parties then commenced the settlement negotiations that led to the 1972 Shakman consent decree—the mutually agreed-upon and court-approved remedy for the past practices that infected state and local employment decisions. See *Shakman v. Dunne*, 829 F.2d 1387, 1389 (7th Cir. 1987) ("*Shakman II*"). As part of those negotiations, the plaintiffs added several defendants, including the Governor of Illinois—Richard Ogilvie at that time—to the eventual consent decree. It is that original agreement from 1972, plus a couple of subsequent decrees (against new units of local government) expanding the scope of the court's supervision of government employment decisions, that we now know collectively as the Shakman decrees. See *Shakman v. Clerk of Cook County*, 994 F.3d 832, 836 (7th Cir. 2021) ("*Shakman VI*").

The express terms of the 1972 decree made its purpose clear: the state could no longer "condition[ ], bas[e] or knowingly prejudic[e] or affect[ ] any term or aspect of governmental employment, with respect to one who is at the time already a governmental employee, upon or because of any political reason or factor." On a prior occasion we recognized that the decree and its attendant federal supervision were necessary to safeguard the speech and associational rights of candidates and voters. See *Shakman II*, 829 F.2d at 1395.

In the years after the decree took effect, the Supreme Court issued two cases affirming the unlawfulness of political patronage in government employment decisions. See *Elrod v.*

*Burns*, 427 U.S. 347, 356–59 (1976) (holding that local govern-
ment could not constitutionally base public employment op-
portunities on political affiliation or nonaffiliation); *Rutan v.
Republican Party of Ill.*, 497 U.S. 62, 79 (1990) (qualifying *Elrod*
and holding that a state generally may not consider political
affiliation in hiring except as to certain exempted political po-
sitions).

In time the Shakman decrees found themselves cemented
on the district court docket. And for decades little seemed to
happen other than the district court receiving annual or quar-
terly reports on the status of ongoing compliance efforts. By
our measure, six different federal judges have overseen the
case since its inception in 1969, with at least 1,000 status re-
ports filed since the original consent decree took effect in 1972.
The federal docket now includes over 10,000 entries—the first
from October 1969 and the most recent from this week. What
may have started with a federal court's well-grounded injunc-
tion came to look more like indefinite federal judicial super-
vision of state employment practices.

B

Fast forward from 1972 to 2014. After decades of quiet, the
Shakman decrees experienced something of a revival. It was
then that the Illinois Office of Executive Inspector General,
which the Illinois General Assembly authorized in 2009 to in-
vestigate and redress political patronage in state employ-
ment, reported multiple decree violations between 2003 and
2013, most especially at the Illinois Department of Transpor-
tation. The Department, the Inspector General's report ex-
plained, had improperly hired, promoted, and transferred
hundreds of individuals based on political considerations

under the Rod Blagojevich administration and for at least part of Pat Quinn's tenure as Governor of Illinois.

By this time, and with the parties' consent, a magistrate judge had assumed responsibility for overseeing the *Shakman* cases. The magistrate responded to the Inspector General's findings by granting a motion to appoint a special master to investigate the extent of the Department of Transportation's noncompliance with the Shakman decree and to recommend and evaluate the implementation of remedial measures. Like the Inspector General, the special master found that officials in the Blagojevich and Quinn administrations "played a key role" in the employment abuses within the Department. Accordingly, the magistrate judge expanded the special master's duties to include review of *all* positions under the Governor's authority. The court set no deadline for either the special master to complete her review or for the Governor to demonstrate sufficient compliance with the decree, but instead committed to "schedule regular meetings and require the submission of periodic reports."

The special master's supervision spurred at least some meaningful remedial action by the Governor. In addition to the already-established Office of Inspector General, Governor Bruce Rauner's administration supported and instituted new remedial measures to account for past abusive practices and to help prevent their recurrence. In 2015, for example, the Inspector General established a new compliance department called the Hiring & Employment Monitoring Division dedicated to guaranteeing state employment practices "are free from political and other manipulation." Additionally, in 2016 the Governor agreed to develop and implement a *Comprehensive Employment Plan* that established guidelines for all

aspects of state employment to prevent a recurrence of impermissible patronage practices. Among other things, the Employment Plan provides that the state should move toward fully automated hiring platforms with an accompanying publicly accessible website containing job postings, position descriptions, and an application process—all to promote transparency throughout employment processes.

The magistrate judge likewise played a role in helping to ensure the Governor moved the state in a new direction by instituting controls to prevent the abuses of the past. The court worked with the parties to approve a new process for reviewing applications of existing employees who sought jobs elsewhere in state government, but who had been hired as part of the improper practices within the Department of Transportation. Even more, it pressed the Governor to adopt a list of those politically appointed positions exempt from the general prohibition on patronage hiring announced in *Rutan*—a list that continues to be updated monthly.

Each of these measures has proven effective, though the parties dispute to what degree. As recently as 2019 the special master reported that Governor J.B. Pritzker has made "significant progress" in complying with the 1972 Shakman decree, including by continuing efforts to implement the state's Comprehensive Employment Plan. To be sure, however, the special master has emphasized that more remains to be done. "[O]pportunities for manipulation" cannot be ruled out, she has explained, especially given the history of political patronage in Illinois.

C

That brings us to more recent developments. In November 2019 the Clerk of Cook County—itself, too, still a separate party the Shakman decrees—filed a motion to vacate the decree. The magistrate judge denied that motion and the Clerk appealed, affording us our sixth opportunity to speak on the case. See generally *Shakman VI*, 994 F.3d 832.

Although we affirmed the denial of the motion to vacate, we sounded serious concerns about the duration and seemingly never-ending nature of the Shakman decrees: "Do not let today's result cloud the grave federalism concerns we have with the fact that the Clerk of Cook County has been under the thumb of a federal consent decree for the last 50 years," we underscored. *Id.* at 843. "Such entrenched federal oversight should have raised red flags long ago." *Id.*

It was against that backdrop—and reassignment of the case from the magistrate judge to the district court—that Governor Pritzker moved under Federal Rule of Civil Procedure 60(b)(5) to vacate the decree. The Governor pressed two positions. *First*, he claimed that, as evidenced by the special master's praise of the state's ongoing efforts to institute durable remedies and her inability to find constitutional violations in recent years, the state had satisfied the requirements of the decree. *Second*, the Governor argued that, separate and apart from the state's showing of recent compliance, continuing the decree would be inequitable because the named plaintiffs lack standing and, regardless, ongoing enforcement after this long offends principles of federalism.

D

In a thorough opinion, the district court denied Governor Pritzker's motion to vacate the 1972 decree. Like the special master, the district court found that while "direct evidence of political motivation is absent" in recent state employment decisions, there were "areas of ongoing concern from which inferences of First Amendment violations can be drawn." Most notably, the district court echoed the special master's concern with the Governor's failure to fully implement certain administrative policies and processes prescribed by the Comprehensive Employment Plan, like adoption of a new electronic hiring system. Deficiencies like these, the district court determined, did not violate the decree but did reveal an ongoing and yet unmitigated risk of potential future violations. Put another way, it was the full implementation of certain risk management policies—like those within the Governor's Employment Plan—that would serve as "the cornerstone of a sunset plan" to the decree.

So too did the district court conclude that the Governor had not shown the Inspector General and Hiring & Employment Monitoring Division to be sufficient solutions to prevent the patronage practices of the past. Although those offices closely supervised the state's compliance with the law, in the district court's view, neither had achieved the durability necessary to release the Governor from federal supervision. Until then, both the special master and the federal court would continue close watch over the Governor of Illinois and every agency under his authority.

In denying the Governor's motion to vacate, the district court also granted in part Shakman and Lurie's request to expand the scope of the special master's duties. In addition to

supervising the Governor's compliance with the Shakman decree, the special master was also now expressly tasked with monitoring the state's implementation of the Governor's Comprehensive Employment Plan and related policies.

Governor Pritzker then appealed.

## II

The standards supplied by Rule 60(b)(5) of the Federal Rules of Civil Procedure guide our analysis. The Rule authorizes a district court to relieve a party from a judgment or order if either (1) "the judgment has been satisfied, released, or discharged" or (2) "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). Governor Pritzker has made the necessary showings on both fronts, and the district court abused its discretion in concluding otherwise. See *Horne v. Flores*, 557 U.S. 433, 447 (2009).

## A

We start with Rule 60(b)(5)'s first ground for vacating a decree—satisfaction. A party claiming to have satisfied the terms of a consent decree must show that it has achieved the objectives of that decree. See *id.* at 450. Once a party has shown that it has substantially complied with the terms of the decree and implemented a durable remedy, "continued enforcement of the order is not only unnecessary, but improper." *Id.* Two primary reasons combined lead us to conclude that the Governor has satisfied the terms of the Shakman decree.

*First*, the last significant violations of the decree seem to have occurred nearly a decade ago with the patronage scandal within the Department of Transportation. The parties point us to none since that time—certainly nothing systemic

within any department under the Governor's supervision. Nor are we aware of any meaningful number of lawsuits alleging that the Governor or any department reporting to him violated the constitutional rules announced by the Supreme Court in *Elrod* or *Rutan*. Indeed, in some two dozen reports by the special master over the past seven years, we see no findings of patronage practices harming individual employees or applicants. Nothing in the parties' appellate briefs suggests otherwise.

*Second*, the Governor has instituted or otherwise supported several remedial measures in recent years (under the special master's and district court's supervision, to be sure) to minimize the risk of political patronage in employment practices. Beyond the development of a Comprehensive Employment Plan, the state now has in place the Hiring & Employment Monitoring Division within the Office of Inspector General and a limited *Rutan* exempt list, among other things. That many of these measures have remained in place for several years with no findings of constitutional violations in or across individual employment decisions speaks to the stability of the state's, and by extension, the Governor's reform measures. Shakman and Lurie, to their credit, candidly acknowledge the Governor's progress in recent years. And, for her part, the special master has on more than one occasion commended the Governor's efforts to comply with the decree, including by describing his accomplishments as "extraordinary," "notable," and "significant."

All of this is enough, we believe, for the Governor to show that he has implemented a durable remedy and satisfied the objectives of the 1972 decree.

Shakman and Lurie, who remain named plaintiffs over a half century after the case began, urge a different approach. To our eye, their focus is not on this or that series of recent hiring (or promotion or transfer) decisions, but instead on the particulars of the Governor's Employment Plan. They contend that the Governor can do more to implement specific measures to further reduce the risk that the state returns to the unlawful ways of its past. Many dimensions of the district court's analysis charted this same course. For instance, in its opinion denying the Governor's motion to vacate, the district court identified areas of "ongoing concern"—specific unfulfilled tasks under the Governor's Employment Plan—"from which inferences of First Amendment violations can be drawn."

While we commend the district court's diligence, we have a hard time with its approach, especially 50 years into the case. What most concerns us is that the special master's oversight—which the district court relied on in denying the Governor's motion to vacate—has drifted beyond any obligation imposed by the decree and, most certainly, the Constitution. Nowhere do we see the special master, the district court, or Shakman and Lurie on appeal relying on the standards articulated in *Elrod* and *Rutan* to identify constitutional violations.

Rather, the special master's reports concentrate on Governor Pritzker's compliance with the finest of details within his own Comprehensive Employment Plan. But that lengthy Employment Plan, as its name implies, is more of a human resource manual than an articulation of the lines separating lawful from unlawful state employment practices. Whether the Governor hires through paper or electronic means, whether he posts job openings on the internet, or whether he

routinely updates position descriptions and titles is of no direct constitutional import. Nor do we see how the full achievement of those specific measures is crucial to a conclusion that the Governor has sufficiently satisfied the aims of the 1972 decree and put in place adequate measures to avoid future constitutional violations. See *Horne*, 557 U.S. at 450 ("[C]ourts must remain attentive to the fact that federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate federal law or does not flow from such a violation.") (cleaned up).

In today's final analysis, the Governor owes his allegiance to the federal and Illinois Constitutions—including the standards announced by the Supreme Court in *Elrod* and *Rutan*. But everything the district court seemed to be assessing was a step removed, focused more on administrative best practices and much less on whether recurring constitutional violations warranted the special master's continued oversight under the direction of a federal court.

In no way are we saying that the risk of unlawful political patronage no longer exists within Illinois. Of course it does: nobody is naïve to the state's embarrassing history. Doubtless more can be done to further reduce risk, improve existing controls, and respond to any allegations of constitutional violations in individual employment decisions. To his credit, Governor Pritzker, through his very able counsel, was quick to acknowledge as much as part of reaffirming the Governor's commitment to maintaining existing remedies and to finalizing implementation of his Comprehensive Employment Plan.

But allowing risk-driven reasoning to carry the day creates a most-concerning risk of its own—that the decree remains in place indefinitely. That prospect too discounts the reforms the

Governor has instituted and that the special master has found in large part to be effective. In essence, Shakman and Lurie are all but insisting that the Governor prove a negative—that he show that no constitutional violations, whether measured at the individual level or more systemically, have recently occurred or will recur in the state's employment practices. That approach asks too much. The controlling question in determining whether to vacate the 1972 decree is whether the Governor has satisfied its objectives, including by implementing a durable remedy to avoid systemic future constitutional violations. We believe he has.

As we see the record, everyone involved in recent years—foremost Governor Pritzker, but also the special master, the district court, and Michael Shakman and Paul Lurie (and their talented counsel)—has been diligent in ensuring the state's substantial compliance with the 1972 decree. This is what is supposed to happen in institutional reform litigation, even if it is coming many, many years too late. We see nothing more for the district court to do. The Governor has satisfied the objectives of the consent decree.

## B

While our analysis could end there, the constitutional implications of a contrary conclusion warrant special emphasis. As the Supreme Court has explained, Rule 60(b)(5)'s equity consideration in a request for relief "serves a particularly important function in what we have termed 'institutional reform litigation.'" *Horne*, 557 U.S. at 447 (quoting *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 380 (1992)). On the record before us, continuing to hold the Governor to the 1972 decree (and everything compliance with it has come to entail in the last 50 years) would affront principles of federalism and leave

the district court playing a role at odds with the Case or Controversy limitation in Article III of the U.S. Constitution.

1

We begin with points all too easy to forget but all too important to a proper framing and resolution of the question before us. The Governor of Illinois is the state's highest ranking elected official—chosen by voters to take the state in particular policy directions and to offer "new insights and solutions." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 442 (2004). Making employment decisions is a meaningful part of the Governor's responsibility and executive prerogative, a way to implement policy choices and to get things done.

The Governor, keep in mind, also swears an oath to uphold both the Illinois Constitution *and* the federal Constitution. As a matter of first principles, the Constitution presumes that state officials "have a high degree of competence in deciding how best to discharge their governmental responsibilities," including how to effectuate constitutional compliance. *Id.*; see also *Lewis v. Casey*, 518 U.S. 343, 349 (1996) (explaining that "it is not the role of courts, but that of the political branches, to shape the institutions of government"). The oath the Governor takes means he swears to comply with the constitutional rulings announced by the Supreme Court in *Elrod* and *Rutan*. If he fails to do so, he (and other state officials) can be sued in state or federal court and held accountable. See 42 U.S.C. § 1983.

Indeed, case-by-case resolution and accountability is the norm from the perspective of our national Constitution. Consent decrees are the rare exception, with long-running decrees being rarer still. Suffice it to say the 50-year-old Shakman

decree reflects a far extreme. While extended federal judicial oversight might serve as an occasional backstop, absent extraordinary circumstances, it should not serve as a primary means of ensuring state officials comply with duties imposed by federal law. Doing so, the Supreme Court has cautioned, risks courts "in the name of the Constitution, becoming enmeshed in the minutiae of [state] operations" and depriving local officials of their own legislative and executive responsibilities. *Lewis*, 518 U.S. at 361 (cleaned up); see also *City of Los Angeles v. Lyons*, 461 U.S. 95, 112 (1983) (declining to enjoin the LAPD's use of chokeholds because of the balance "to be preserved between federal equitable power and State administration of its own law") (cleaned up).

These principles are far from theoretical or aspirational. To the contrary, they supply a concrete guidepost for resolving this case: a federal court must "ensure that when the objects of the decree have been attained, responsibility for discharging the state's obligations is returned promptly to the state and its officials when the circumstances warrant." *Frew*, 540 U.S. at 442.

We have reached that point: leaving the Governor subject to the 1972 decree is no longer warranted or tolerable. Governor Pritzker has demonstrated substantial compliance with the decree and identified and instituted durable remedies to help ensure that compliance sticks. He has earned the right to make employment decisions for the state on his own and not under the terms and conditions of the 1972 decree or the watchful eyes of a special master and federal court. We cannot let perfect be the enemy of the constitutionally adequate.

2

Beyond these federalism concerns, we have an equally dif-
ficult time identifying any remaining Case or Controversy.
But within our constitutional design, where powers are sepa-
rated between branches, that is all federal courts have the au-
thority to do—resolve concrete disputes between adverse par-
ties. See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573–76
(1992); see also *Lewis*, 518 U.S. at 349 (emphasizing that "[i]t is
the role of courts to provide relief to claimants, in individual
or class actions, who have suffered, or will imminently suffer,
actual harm"). Article III brings with it no license to oversee
the development of a state's human resource policies—at least
not for 50 years and counting.

Eight gubernatorial administrations have come and gone
in Illinois since the initiation of this lawsuit. Yet the same
named plaintiffs that brought the original suit in 1969 con-
tinue to prosecute enforcement of the decree under the district
court's watch and, more recently, the eyes of a special master.
It is far from clear this arrangement comports with the Su-
preme Court's emphasis in recent years on separation of pow-
ers and the related demands imposed by Article III for estab-
lishing and maintaining a Case or Controversy. See *Lujan*, 504
U.S. at 560–63. The proper equitable analysis of whether the
Governor should remain under the 1972 decree requires us
"to recognize that the longer an injunction or consent decree
stays in place, the greater the risk that it will improperly in-
terfere with a State's democratic processes." *Horne*, 557 U.S.
at 453.

No longer is the Shakman decree's enforcement necessary
to protect the First Amendment rights of state employees and
job applicants as declared in *Elrod* and *Rutan*. Rather, its

continued application has put a federal court in a role tantamount to serving as an indefinite institutional monitor—not much different than an executive or legislative branch oversight agency—focused much more on ensuring that the Governor implements best practices rather than eliminates "an ongoing violation of federal law." *Horne*, 557 U.S. at 454. This is antithetical to the limited role the Constitution created for the Third Branch: Article III does not "confer on federal judges some amorphous power to supervise the operations of government and reimagine from the ground up" the employment practices of Illinois. *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 532 (2021) (cleaned up).

Be careful not to misread our conclusion. The district court is not closing. To the contrary, it will remain open and receptive to individual claims brought by persons able to allege concrete and particularized injuries as a result of unlawful patronage practices by the Governor or departments under his supervision. And nothing will prevent such plaintiffs from requesting not just money damages, but also appropriate injunctive relief. So, while today's decision relieves the Governor of complying with the Shakman decree, the First Amendment remains alive and well. Future violations of the rules announced in *Elrod* and *Rutan* may see new plaintiffs bringing new cases requesting new and stiff remedies, all the while emphasizing the tragic history that led to the Shakman decrees.

\*       \*       \*

We REVERSE the district court's denial of the motion to vacate and its expansion of the special master's duties and REMAND with instructions to VACATE the 1972 consent decree as it applies to the Governor of Illinois.